# STUART v. EASTON.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 197. Argued April 12, 13, 1898. — Decided May 9, 1898.

The construction and legal effect of a patent for land is matter for the court, and evidence to aid in that construction is incompetent.

The clear intent of the act of the Province of Pennsylvania of March 11, 1752, authorizing trustees to acquire the land in question, was, that while the legal estate in fee in the land should be acquired by the trustees, the beneficial use or equitable estate was to be in the inhabitants of the county; and the provision following the authorization to acquire the land, " and thereon to erect and build a court house and prison," was

no more than a direction to the trustees as to the use to be made of the land after it had been acquired.

The language of the habendum that the conveyance is "in trust," nevertheless to and for the erecting thereon a court house for the public use and service of the said county, and to and for no other use, intent or purpose whatsoever, under the decisions of the courts of Pennsylvania amounted simply to conforming the grant to the legislative authority previously given, and cannot be deemed to have imported a limitation of the fee.

The purposes of the grant by the patent of 1764 of the lot in the centre of the public square at Easton, in conformity to the clear intent of the act of 1752, was undoubtedly to vest an equitable estate in the land in the inhabitants of the county, the trust in their favor being executed so soon as the county became capable of holding the title.

If the grant be viewed as one merely to trustees to hold " for the uses and purposes mentioned in the act of the assembly," it is clear that the fee was not upon a condition subsequent nor one upon limitation.

Without positively determining whether the estate in the county is held charged with a trust for a charitable use, or is an unrestricted fee simple on the theory that the trustees were merely the link for passing the title authorized by the act of 1752, it is *held*, that the trial court did not err in directing a verdict for the defendant.


By an act of the general assembly of the Province of Pennsylvania, passed on March 11, 1752, Penn. Provincial Laws 1775, p. 235, c. 2, the county of Northampton was erected out of a portion of the county of Bucks. In the sixth and seventh clauses of the act it was provided as follows: .

"VI. And be it further enacted by the authority aforesaid, That it shall and may be lawful to and for Thomas Craig, Hugh Wilson, John Jones, Thomas Armstrong and James Martin, or any three of them, to purchase and take assurance to them and their heirs of a piece of land situate in some convenient place in the said town (of Easton,) in trust, and for the use of the inhabitants of the said county, and thereon to erect and build a court house and prison, sufficient to accommodate the public service of the said county, and for the ease and convenience of the inhabitants.

"VII. And be it further enacted by the authority aforesaid, That for the defraying the charges of purchasing the land, building and erecting the court house and prison aforesaid, it shall and may be lawful to and for the commissioners and as-

sessors of the said county, or a majority of them, to assess and levy, and they are hereby required to assess and levy so much money as the said trustees, or any three of them, shall judge necessary for purchasing the land and finishing the said court house and prison. Provided, always, the sum of money, so to be raised, does not exceed three hundred pounds, current money of this province."

On March 4, 1753, an act was passed in which it was recited that the amount specified in the act of March 11, 1752, had been expended in building a prison, and authority was given to assess and levy a further sum not exceeding a stated amount, as the persons named in the act, or any three of them, should judge necessary for building a court house and finishing the prison already erected.

On July 9, 1762, the following warrant of survey was issued:

" PENNSYLVANIA, ss.

" By the Proprietaries.

"Whereas in and by an act of General Assembly of this Province entitled 'An Act of erecting the Northwest part of Bucks into a separate County,' which in and by the said act is called Northampton and Thomas Craig, Hugh Wilson, John Jones, Thomas Armstrong and James Martin, or any three of them, were appointed Trustees to purchase and take assurance to them and their heirs of a piece of land situate in some convenient place in the Town of Easton in the said County, and thereon to erect and build a Court House and Prison sufficient to accommodate the public service of the said County, and for the ease and convenience of the inhabitants, as in and by the said act appears. And whereas on application and request of said Trustees, and out of our regard to encourage and promote the Improvement of the said Town and general good and convenience of the inhabitants of the said County, we have condescended and agreed to grant to the said trustees a lot or piece of ground of Eighty Feet square to be laid out in the centre of the great square in the middle of the said Town of Easton for a Court House for the use and the accommodation of the inhabitants of the said town and County forever. These are

therefore to require you to survey and lay out, or cause to be surveyed and laid out, a lot or piece of ground in the centre of the great Square in the said Town of Easton of the said dimensions of Eighty feet square for the public use of a Court House for the inhabitants of the said town and county, and make return thereof into our Secretary's Office in order for confirmation to the said Trustees and their heirs for the use aforesaid, and for your so doing this shall be your sufficient Warrant.

"Given under my hand and the seal of the Land Office, by virtue of certain powers from the said Proprietaries at Philadelphia, the ninth day of July, 1762.

"To John Lukens,                    James Hamilton.
           "Surveyor General."

A survey was made and returned, in which it was recited :

"In pursuance of a Warrant dated the 9th day of July, 1762. Surveyed the 8th day of October, 1763, to Thomas Craig and others the above described Lot of Ground Situate in the Public Square of the Town of Easton in the County of Northampton. Containing in length North & South eighty feet and in breadth East & West eighty feet."

Forming part of the certificate was a plat exhibiting a large open space, three hundred and twenty feet square, intersected from north to south and east to west by two eighty feet wide streets (Northampton and Pomfret). In the centre of the open space referred to, facing the streets mentioned, was a square plot of ground, marked as being eighty feet on each side.

On September 8, 1764, a patent was executed as follows :

"Thomas Penn & Richard Penn Esquires true and absolute Proprietaries and Governors in Chief of the Province of Pennsylvania & Counties of Newcastle Kent and Sussex upon Delaware  To all unto whom these Presents shall come Greeting  Whereas in and by an Act of General Assembly of the said Province passed in the twenty fifth year of the Reign of our late Sovereign Lord the Second Intituled 'An Act for Erecting the North West part of Bucks into a sepa-

rate County' which in and by the said Act is called North-ampton and John Jones Thomas Armstrong James Martin John Rinker and Henry Allshouse or any of them are appointed Trustees to purchase and take Assurance to them and their Heirs of a Piece of Land situate in some convenient Place in the Town of Easton in the said County and thereon to erect and build a Court House & Prison sufficient to accommodate the public Service of the said County as by the said Act appears   And whereas in Pursuance of a Warrant dated the ninth of July 1762 under the Seal of our Land Office we have at the special Instance & Request of the said Trustees caused a Lot of Ground situate in the Center of the said Town of Easton to be laid out for a Court House for the Public Use and Service of the said County (another Lot of Ground in the said Town having been heretofore laid out for a Prison or Common Gaol erected thereon) which said lot in the Center Square contains in Length North and South eighty feet and in Breadth East and West eighty feet   As by the said Warrant and Survey of the said Lot remaining in the Surveyor Generals Office and from thence Certified into our Secretarys Office more fully appears   Now know ye that for the further Encouragement and better promoting the Public Benefit and Service of the said Town and County   And for and in Consideration of the yearly Quitrent herein after reserved | and of the Sum of Five Shillings to us in Hand paid by the said Trustees   (The Receipt whereof is hereby acknowledged)   We have given granted released confirmed & by these Presents do give grant release and confirm unto the said Trustees John Jones Thomas Armstrong James Martin John Rinker and Henry Allshouse and their Heirs the said Lot of Ground situate in the Center of the Great Square in the said Town of Easton containing Eighty feet in Length North & South and eighty feet in breadth East and West Together with all Ways Waters Watercourses Liberties Easements Privileges Profits Commodities Advantages and Appurtenances thereto belonging And the Reversions and Remainders thereof   To have and to hold the said herein before described Lot of Ground with the Appurtenances unto

the said John Jones Thomas Armstrong James Martin John Rinker and Henry Allshouse their Heirs and Assigns for ever In Trust nevertheless to and for the Erecting thereon a Court House for the public Use and Service of the said County and to and for no other Use Intent or Purpose whatsoever to be holden of us our Heirs and Successors Proprietaries of Pennsylvania as of our Manor of Fermor in the County of Northampton aforesaid in free and common Soccage by Fealty only in Lieu of all other Services Yielding & Paying therefor yearly unto us, our Heirs and Successors, at the Town of Easton aforesaid at or upon the first day of March in every Year from the first day of March next one Red Rose for the same or value thereof in Coin Current according as the Exchange shall then be between our said Province and the City of London to such Person or Persons as shall from Time to Time be appointed to receive the same And in Case of Nonpayment thereof within ninety days next after the same shall become due That then it shall and may be lawful for us our Heirs and Successors our and | their Receiver or Receivers into and upon the hereby granted Lot or Piece of Ground and Premises to Reenter and the same to hold and Possess until the said Quitrent and all arrears thereof Together with the Charges accruing by Means of such Nonpayment and Reentry be fully paid and discharged

"Witness John Penn Esquire Lieutenant Governor of the said Province who by virtue of certain Powers and Authorities to him for this Purpose inter alia granted by the said Proprietaries hath hereunto set his Hand and caused the Great Seal of the said Province to be hereunto affixed at Philadelphia this twenty eighth day of September, in the Year of our Lord one thousand seven hundred and sixty four The Fourth year of the Reign of George the Third the King over Great Brittain &c And Forty seventh Year of the said Proprietaries Government."

A court house was built upon the property between the years 1763 and 1766 and remained thereon until the year 1862, when it was removed. No buildings have since been placed upon the ground, but it was asserted in argument that a public fountain had been erected thereon.

By an act of the general assembly of Pennsylvania of date April 15, 1834, the title of the trustees was vested in the county of Northampton.

On July 25, 1888, William Stuart, as sole heir of the original grantors, by his duly authorized attorney, made entry upon the lot in question for a breach of an alleged condition as to its use, claimed to have been incorporated in the patent of 1764, and which, it was asserted, revested the land in the claimant as succeeding to the rights of the original grantors. Being ousted by the representatives of the county of Northampton and the citizens of Easton, Stuart soon after instituted an action of ejectment in the United States Circuit Court for the Eastern District of Pennsylvania to recover possession of the land. At the trial a verdict was directed for the defendant, and the case subsequently came into this court for review, when the judgment was reversed because of an omission of the plaintiff to properly plead his alienage. 156 U. S. 46. Thereafter, William Stuart having died, his son, the present plaintiff in error, was substituted as plaintiff, and, the pleadings having been amended, a new trial of the action was had in April, 1895. During the course of the trial counsel for the plaintiff separately offered in evidence:

1. A certified copy of the deed referred to in the acts of 1752 and 1753, acquiring land on which to erect a prison, stating that he proposed to follow this by the offer of a subsequent grant to the county by the heirs of Penn of the reversion of the prison lands. The purpose of the offer was declared to be to throw light on the terms of the grant of land for the court house, and thereby to demonstrate that the county was estopped from claiming that the grant of such land by the patent of 1764 was not upon a condition.

2. A deed by Granville John Penn and Richard Penn to the county of Northampton, dated in 1852, for the reversion in the prison lot, which was offered for two purposes: first, for the former purpose of establishing an estoppel upon the county; and, second, to show grants by Penn of land in the township of Easton subsequent to the Divesting Act; to be followed by other deeds made by Penn subsequent to the Divesting Act.

The Divesting Act referred to was an act passed November 27, 1779, (1 Smith's Laws, 479,) vesting the title to the Province of Pennsylvania in the Commonwealth.

3. A deed by John Penn to Peter Schuyler et al., for a lot in the county of Easton, subsequent to the Divesting Act.

4. A certified copy from the books of the land office, showing that the records of the Department of Internal Affairs of Pennsylvania contain a number of warrants issued for lots in the town of Easton, Pennsylvania, and surveys made in pursuance thereof, and lots granted by the proprietaries of the Province of Pennsylvania.

5. That no evidence can be found to indicate that any warrants were issued, and surveys made or patents granted by the Commonwealth of Pennsylvania for any lots in the town of Easton, Pennsylvania.

Offers Nos. 3, 4 and 5, it is claimed in argument, were made to establish that the property in question was part of the private estate of the Penns, preserved to them by section 8 of the Divesting Act.

Upon objection that the evidence was irrelevant to the issue, it was excluded, and exceptions to such rulings were reserved.

At the close of the testimony for the plaintiff, counsel for defendant moved the court to direct a verdict for the defendant. This motion was granted, the court instructing the jury that the deed on its face was a conveyance to trustees for the use and benefit of the people of Northampton County in the erection and use of public buildings, and that the land had not reverted to the grantors by a diversion of the use. Judgment having been entered in favor of the defendants, the cause was taken by writ of error to the United States Circuit Court of Appeals for the Third Circuit, which affirmed the judgment. 39 U. S. App. 238J A writ of certiorari was subsequently allowed by this court.

*Mr. C. Berkeley Taylor* and *Mr. A. T. Freedley* for Stuart. *Mr. William Brooke Rawle* was on their brief.

*Mr. Aaron Goldsmith* and *Mr. Edward J. Fox* for Easton.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The errors assigned are misdirection in instructing the jury to render a verdict for the defendant and wrongful exclusion of the offered evidence. We at once dismiss the latter assignments from consideration. The evidence offered to aid in the construction of the patent was clearly incompetent, as the patent, being a written instrument, its construction and legal effect were a matter for the court, and, even if an estoppel had been pleaded, the excluded evidence could not have estopped the county from asserting that the patent of 1764 had the meaning contended for. As regards the evidence offered to establish that the rights of the proprietaries, if any, in the property in question had not been cut off by the Divesting Act, the evidence, if not cumulative, was clearly not material, if by the terms of the patent, as we hold to be the case, no interest in the land granted thereby remained in the grantors.

*Did the trial court improperly direct a verdict for the defendant?*

This question requires an interpretation of the grant contained in the patent of 1764; and, as the question arising on such construction relates to the title to real property, we must, in reaching a conclusion, be guided by the local law of Pennsylvania, the State in which the land is situated.

We premise our examination of the terms of the patent with the following extract from the opinion delivered by Kennedy, J., in *Ingersoll* v. *Sergeant*, 1 Wharton, 337, 348:

"King Charles the 2nd, in granting the Province of Pennsylvania to William Penn and his heirs, gave it to be held in free and common socage, and by fealty only, for all services. And by the seventeenth section thereof, William Penn, his heirs and assigns had full and absolute power given to them, at all times thereafter, and forever, to assign, alien, grant, demise or enfeoff such parts and parcels thereof to such persons as might be willing to purchase the same, their heirs and assigns, in fee simple, fee tail, for term of life, lives or years,

to be held of the said William Penn, his heirs and assigns as of the seigniory of Windsor by such services, customs and rents as should seem fit, to the said William Penn, his heirs and assigns, and not immediately of the said King Charles, his heirs or successors. And, again, by the 18th section, it was further provided, that the purchasers from William Penn, his heirs or assigns, should hold such estates as might be granted to them, either in fee simple, fee tail, or otherwise, as to the said William Penn, his heirs or assigns, should seem expedient, the statute of *quia emptores terrarum* in anywise notwithstanding."

The proper construction of the patent in question is free from difficulty when construed in connection with the act of the assembly to which the patent refers. The act of 1752 constituted the authority of the trustees for acquiring the land in question, and that authority was to the individuals named in the act " to purchase and take assurance to them and their heirs of a piece of land situate in some convenient place in the said town of Easton, in trust and for the use of the inhabitants of the said county." The inhabitants of the county of Northampton not being a corporation, were unable to take a direct conveyance of the land, but the clear intention of the statute was that while the legal estate in fee in the land should be acquired by the trustees, the beneficial use or equitable estate was to be in the inhabitants of the county. The provision following the authorization to acquire the land, " and thereon to erect and build a court house and prison," was no more than a direction to the trustees as to the mode of use to be made of the land after it had been purchased.

The authority to the trustees being to " purchase," adds force to the clear implication that it was the intention of the assembly that a title in fee simple should be acquired. When, therefore, we find a recital in the patent that it is conveyed upon a named consideration, and the patent expressly refers to the act of the assembly as the authority from which the patentees derived the power to take and hold the property, we naturally infer an intention of the parties on the one hand to convey, and on the other to receive, just such an estate in

the land as the act contemplated. It is true that the consideration is apparently nominal, but, at common law, in a deed like the one in question, a pecuniary consideration, however small, was sufficient to divest the title. *Queen v. Porter*, 1 Rep. 22, 26; *Van Der Volgen* v. *Yates*, 9 N. Y. 219.

The patent expressly purports to convey the fee, the reservation of an annual quitrent of a red rose being merely a feudal acknowledgment of tenure, *Marshall v. Conrad*, 5 Call, 364, 398, which was in effect annulled by the Revolution and acts of the assembly of Pennsylvania subsequently passed, declaring all lands within the Commonwealth to be held by a title purely allodial. In the premises the grant is to the trustees by name "and their heirs," while the habendum is to the individuals theretofore referred to as the trustees, "their heirs and assigns forever. In trust, nevertheless, to and for the erecting thereon a court house for the public use and service of the said county, and to and for no other use, intent or purpose whatsoever." This last clause, it is claimed, qualifies the prior grant of an estate in fee, and limits the duration of the estate in the land to the period while the land was used as the site of a court house. But, it will be remembered, that the act of 1752 authorized the acquisition of a lot upon which the trustees were directed to build a court house *and prison*, and the act of 1753 recited that the amount authorized by the act of 1752 to be expended for a court house and prison had already been expended for building a prison, and authority was given to assess and levy a further sum for the erection of a court house. The patent of 1764 recited the fact that another lot of ground had been laid out for a prison site, and it may be well in reason considered that had the act of 1752 authorized solely the erection of a court house instead of a court house and prison, that the clause to which we have referred would have simply recited that the patentees were to hold the land for the uses and purposes mentioned in the act of the assembly. In the condition in which matters stood, however, the recital that the land was to be held in trust for the object stated may well be treated as having been inserted with the intent of showing that the grant related alone to one

of the purposes covered by the law, the court house, and not to both therein expressed; that is, the prison and the court house. Be it as it may, however, under the facts disclosed by the record, the decisions of the courts of Pennsylvania leave no doubt that the clause in question cannot be construed as anything more than a recognition of the trust previously created by the act of the general assembly, and that it amounted simply to conforming the grant to the legislative authority previously given, and that it cannot be deemed to have imported a limitation of the fee. Thus in *Slegel* v. *Lauer*, 148 Penn. St. 236, whilst it was held that the grant there considered, though absolute in terms, merely conveyed a fee on limitation, because the purpose expressed in the grant was not one for which counties usually acquired a fee simple in lands, the court reviewed the cases of *Kerlin* v. *Campbell*, 15 Penn. St. 500; *Griffitts* v. *Cope*, 17 Penn. St. 96; *Brendle* v. *German Reformed Congregation*, 33 Penn. St. 415, and *Seebold* v. *Shitler*, 34 Penn. St. 133, and declared the doctrine established by those cases to be that where a conveyance purporting to be in fee is made to public trustees or commissioners, religious societies, etc., for the particular purpose for which the grantees could lawfully hold real estate, such declaration could not be construed as qualifying a prior grant of the fee. The court said (p. 241):

"Of course, the mere expression of a purpose will not of and by itself debase a fee. Thus, a grant in fee simple to county commissioners of land 'for the use of the inhabitants of the Delaware County to accommodate the public service of the county,' was held not to create a base fee: *Kerlin* v. *Campbell*, 15 Penn. St. 500; as also a grant to county commissioners and their successors in office of a tract of land with a brick court house thereon erected, 'in trust for the use of said county, in fee simple,' the statute under which the purchase was made authorizing the acquisition of the property for the purpose of a court house, jail and offices for the safe keeping of the records: *Seebold* v. *Shitler*, 34 Penn. St. 133. Similarly a devise of land to a religious body in fee 'there to build a meeting house upon,' etc., was held to pass an unquali-

fied estate : *Griffitts* v. *Cope*, 17 Penn. St. 96; as was also a grant to a congregation 'for the benefit, use and behoof of the poor of said . . . congregation, . . . forever, and for a place to erect a house of religious worship, for the use and service of said congregation, and if occasion shall require, a place to bury their dead :' *Brendle* v. *German Reformed Congregation*, 33 Penn. St. 415. . . .

"It is apparent in all the cases cited that the purposes for which the grants were made were really all the purposes for which the grantees could lawfully hold real estate. Unless, therefore, the absurd position be assumed that a corporation can, in no event take a fee simple absolute, because its power to hold land is limited to the uses for which it is authorized to acquire and employ it, a declaration, in the grant, that it is conveyed for those uses cannot be deemed to import a limitation of the fee. *Expressio eorum quæ tacite insunt nihil operatur.* Such a declaration can amount to no more than an explicit assertion of the intended legality of the grant."

The case at bar is precisely analogous in its main features to the facts which were under consideration in *Kerlin* v. *Campbell, supra,* the only difference being that in the case just cited, instead of the purpose for which the land was to be held being specified in the grant, a declaration of trust was made in a separate instrument. The facts in the *Kerlin case* were as follows : Certain public buildings had been erected on land and the land with the erections was sold to a private individual. Subsequently, five named individuals, or any three of them, were authorized by statute "to take conveyances and assurances to them, and their heirs, of the said old court house, and of the prison and workhouse, in the said borough of Chester, with the lots of ground thereunto belonging, in trust, and for the use of the inhabitants of the said county of Delaware, to accommodate the public service of the said county." A deed was made in pursuance of this act to the individuals named "and to their heirs and assigns" for an expressed consideration, "to have and to hold the same to them, their heirs and assigns forever." A declaration of trust was made contemporaneously with the deed, reciting

that the latter instrument had been made or was intended to be "in trust and for the use of the inhabitants of the said county of Delaware, to accommodate the public service of the said county, according to the true intent and meaning of the said recited act of assembly;" and also declaring that the interest held in the land and buildings was "only to and for the uses and services hereinbefore mentioned, expressed and declared, and to and for no other use, interest or purpose whatsoever." A part of the lot and the workhouse building thereon having been subsequently sold to a private individual under authority of an act of assembly, the heirs of the original grantor brought ejectment to recover possession, upon the ground that the property was granted for a grossly inadequate consideration, if the unrestricted fee was conveyed, and that the deed to the individuals named in the original act and the declaration of trust by them executed was but a single transaction and constituted a conveyance to the parties named, in trust to and for the use of the inhabitants of the county of Delaware, to accommodate the public service of the said county, according to the true intent and meaning of the act of assembly, and to no other use, intent or purpose whatsoever, and that the estate which the trustees took was a base or determinable fee; in other words, an interest which might continue forever, but was liable to be determined, without the aid of a conveyance, by some act or event circumscribing its continuance or extent. On the part of the defendants in error it was contended that the transaction was a purchase, and not a trust. The court said (p. 506):

"The doctrine of charitable uses is inapplicable to a question like the present. Had the ancestor of the plaintiffs conveyed the property as a gratuity to be used in a particular way, he might have had a plausible case on the cessation of the user; but he conveyed it for its value, by an absolute deed, to persons who executed a declaration of trust, not for his benefit, but to vest the equitable ownership in the county. After that, it is impossible to conceive of a dormant interest in him. The two deeds, though executed at the same time, were as diverse as if the latter were a conveyance of the legal title to a stranger,

with whom the grantor in the first could not be in privity. There could be no resulting trust, for every part and particle of the grantor's estate, legal or equitable, present or prospective, had passed from him and was paid for. Nor was the estate granted a base fee. It was unclogged with conditions or limitations. The ancestor received a full consideration for it; and the plaintiffs cannot rescind the bargain."

We think the two cases are not distinguishable in principle. The purpose of the grant by the patent of 1764 of the lot in the centre of the public square at Easton, in conformity to the clear intent of the act of 1752, was undoubtedly to vest an equitable estate in the land in the inhabitants of the county, the trust in their favor being executed so soon as the county became capable of holding the title. While the proprietaries may have been mainly influenced in making the grant by a desire to advance the interests of the town, or were actuated by motives of charity, yet the transaction was not a mere gift, but was upon a valuable consideration, and it was the evident intention of the grantors to convey all their estate or interest in the land for the benefit of the county. The declaration in the patent of the purposes for which the land was to be held, conjoined as it was with a reference to the act of the assembly wherein the trust was created, could not have the effect of qualifying the grant of the fee simple, any more than if the declaration of the purposes for which the land was to be held had been omitted and a declaration of the trust made in an independent instrument.

If the grant be viewed as one merely to trustees to hold " for the uses and purposes mentioned in the act of the assembly," it is clear that the fee was not upon a condition subsequent nor one upon limitation. There are no apt, technical words (such as *so that; provided; if it shall happen;* etc., 4 Kent Com. note *b*, p. 132; 2 Washburn on Real Property, p. 3) contained in the grant, nor is the declaration of the use coupled with any clause of reëntry or a provision that the estate conveyed should cease or be void on any contingency. (Ib.) So, also, we fail to find in the patent the usual and apt words to create a limitation (such as *while; so long as; un-*

*til; during;* &c., 4 Kent, Ib.), or words of similar import. And, for reasons already stated, if we disregard the absence of technical terms or provisions importing a condition or limitation, and examine the deed with a view of eliciting the clear intention of the parties, we are driven to the conclusion that it was the intention of the grantors to convey their entire estate in the land.

The cases mainly relied upon as supporting the claim of the plaintiff in error that by the patent an estate was conveyed which was " to be commensurate in duration with the purpose to be answered by it," clearly present no analogy in their facts to the case at bar. Thus, in *Kirk* v. *King*, 3 Penn. St. 436, 438, the material part of the conveyance reads as follows:

··" Know all men by these presents, that I, Thomas McElroy, of Plum township, in the county of Allegheny, for and in consideration of the sum of 50 cents to me in hand paid, the receipt of which is hereby acknowledged, have granted, bargained and sold, and by these presents do grant, bargain and sell, to the employers of the school at Plum Creek meeting house that lot of land, beginning [describing it], to have and to hold said lot for an English school house and no other purpose, for me, my heirs, and assigns, to them who are now, or may hereafter be the employers of said school, to have and to hold the same forever for said purpose.

. "Witness my hand and seal," etc.·

It will be noticed that the deed did not contain words of inheritance or expressly purport to convey a fee simple; and in *Wright* v. *Linn*, 9 Penn. St. 433, the decision in *Kirk* v. *King* was construed to hold that " The legal title remained in the original owner, the 'school company' having but an equity, which was thought to be dependent on the agreement to use the ground 'for an English school house and for no other purpose.'" In other words, the deed was construed as making the substantial consideration of the grant the erection of the school house, and as though the land was conveyed, in terms, to the grantees, to have and to hold the same *so long* as they used it for an English school house. And the court in the *Wright case*, while questioning the correctness of the holding

in the *Kirk case*, that the deed there considered did not establish a trust for a charitable use, not liable to be defeated by non user, said (p. 438):

" It has long been held, that money given to build or repair a church, is given to a charitable use; and surely it must be agreed that land given as the site of a public school house, *prima facie*, stands in the same category. It may be otherwise where the object in the contemplation of the party is ephemeral, and the subject sought to be promoted is intended to be of temporary duration. This is the point on which *Kirk* v. *King* was made to turn; and, where such is the case, perhaps the grant may be taken as on an implied condition of reverter, as soon as the temporary object is accomplished. But such a condition should either expressly appear or be unerringly indicated by the circumstances attendant on the gift."

The object to be attained by the grant in the case at bar was, however, not ephemeral in its character, the assurance being expressly to the trustees and their heirs and assigns forever; while the attendant circumstances we have heretofore alluded to rebut any inference of an implied reverter.

*Scheetz* v. *Fitzwater*, 5 Penn. St. 126, also relied on, was the case of a conveyance " of a certain mill dam or pond of water, and mill race or stream of water, issuing and proceeding from said mill dam or pond of water, as the same is now situate, and being in and upon a certain tract or parcel of land situate in the manor of Springfield, together also with the site and soil of the said mill pond or dam of water and race of water, and also one perch of land on each and every side of the said pond, or dam and race of water, to and for the use and service of a certain mill, with the land thereto belonging, and for no other use whatsoever." The deed did not contain words of inheritance or expressly grant a fee simple. The grant was of the mill dam, etc., and, in the same sentence, the qualification was attached that it was for a particular use only, that is, "for the use and service of a certain mill, with the land thereto belonging."

The mill pond having been drained and converted into a

meadow, the claim was made that there had been a diversion from the purposes of the grant, and an action was commenced for the taking of grass from the site of the mill pond. The trial judge held that a fee simple estate in the land had not been conveyed, but that it was the intention of the grantor to only convey a qualified interest in the land or limited fee, and to retain a reversionary interest, and that the estate in the grantee determined on the abandonment of the use and service for which the conveyance had been made as stated in the deed. The appellate court held this construction to be correct.

*First Methodist Episcopal Church* v. *Old Columbia Public Ground Co.*, 103 Penn. St. 608, is relied upon as sustaining the proposition that where a deed refers to a certain mode of user of the land conveyed, coupled with words such as "and for no other use," a conditional estate is granted. The decision, however, does not justify this broad statement. The action was ejectment. One Wright had covenanted under seal to convey certain property to named parties, their heirs or assigns, in fee simple, clear of all incumbrances, in trust for the sole use of a company which might thereafter be formed for the purpose of bringing a supply of water into the borough of Columbia, the grantees covenanting to give, grant and assure unto Wright, his heirs and assigns, when a reservoir should be erected, "the privilege of erecting a hydrant at said reservoir at his own expense and for his own use, and shall have a supply of water therefrom sufficient to water his cattle or stock or for the use of a family at all times when the same is in repair or water sufficient therein." A deed was subsequently made to the water company, and that corporation constructed a reservoir on the land, but subsequently abandoned the same, filled up the reservoir and sold the land, and the purchaser erected a chapel thereon. Ejectment was brought by the grantees of the heirs of Wright to recover possession of the land. The trial judge held that under the agreement first referred to the grantees took a base or qualified fee only, and when they and their vendees ceased to use the land for a reservoir it reverted to Wright or his heirs.

The appellate court, however, held that a conditional estate had not been created by the deed, and discussed the effect of the grant solely as to whether an estate upon condition subsequent was created. After reviewing various authorities holding that a mere recital in a deed that it was made upon a certain consideration, while it might create a covenant, would not raise a condition, the court said (p. 614):

"Whatever words are relied on as creating a condition must not only be such as of themselves would create a condition, but must be so connected with the grant as to qualify or restrain it. *Labaree* v. *Carleton*, 53 Maine, 211. It was said by Mr. Chief Justice Bigelow in *Packard et al.* v. *Ames et al.* 16 Gray, 327: 'We know of no authority by which a grant declared to be for a special purpose, without other words, can be held to be a condition. On the contrary, it has always been held that such a grant does not convey a conditional estate unless coupled with a clause for the payment of money or the doing of some act by the grantee on which the grant is clearly made to depend.' To make the estate conditional the words must clearly show such intent. *Cook* v. *Trimble*, 9 Watts, 15.

"Turning to the writing executed by Wright, we see that he absolutely and unconditionally covenanted to convey the premises in fee simple clear of all incumbrances to the vendees, their heirs, or assigns, whenever requested by them. No restraint was imposed on an alienation of the land. No construction of a reservoir, nor any work on the ground, was required to precede the right to demand a deed. No clause provided for a forfeiture or termination of the estate, in case the land ceased to be used as a reservoir. No right of reëntry was reserved by the grantor on any contingency. No technical word to create a condition was used. No other words were used, equivalent thereto or proper to create a condition. The authorities show that the recital of the consideration and a statement of the purpose for which the land is to be used are wholly insufficient to create a conditional estate."

At page 613 of the opinion, it is true, the cases of *Kirk* v. *King* and *Scheetz* v. *Fitzwater* are referred to as though the

grants considered in those cases were of estates upon condition subsequent, and as illustrating the proposition that words clearly equivalent to the technical words usually employed to create a condition would be sufficient. Weight was attached to the circumstance that the grants in those cases were expressed to be for a particular named use, "and no other purpose;" but it is manifest that importance was attached not alone to the emphatic statement of the particular use expressed, but to that language coupled with the other provisions of the grant.

But, manifestly, under the authorities referred to in the *Slegel case* which we have above cited, the declaration of the purposes contained in the patent under consideration had not the effect of qualifying or limiting the estate in fee expressly granted to the trustees for the benefit of the inhabitants of the county, and which has since become vested, by act of the legislature, in the county of Northampton. Without, however, positively determining whether the estate in the county is held charged with a trust for a charitable use, or is an unrestricted fee simple on the theory that the trustees were merely the link for passing the title authorized by the act of 1752, *Brendle* v. *German Reformed Congregation*, 33 Penn. St. 415, 425, we hold that the trial court did not err in directing a verdict for the defendant, and the judgment of the Circuit Court of Appeals must therefore be

*Affirmed.*

Mr. Justice Brown concurred in the result.