[Civ. No. 12748.   First Dist., Div. Two.   May 16, 1945.]

LAUREL HILL CEMETERY ASSOCIATION (a Corporation), Respondent, v. ALL PERSONS et al., Defendants; STEPHEN H. AUSTIN et al., Appellants.

Sefton & Quattrin and Seibert L. Sefton for Appellants.

Myrick & Deering and Scott, James Walter Scott, Stoney, Rouleau, Stoney & Palmer and Royal E. Handlos for Respondent.

NOURSE, P. J.—Plaintiff sued to quiet title to real property, naming as defendants "all persons" in accordance with the act "to provide for the establishing and quieting of title to real property in case of the loss or destruction of public

records," Deering's General Laws, Act No. 1026. Three persons claiming an adverse interest in the property appeared and set up their claims. Judgment went for the plaintiff quieting its title and decreeing that the defendants had no interest in the property. The three defendants have joined in an appeal from the judgment.

The plaintiff bases its claim of title upon a deed from the city and county of San Francisco dated June 23, 1871, and the United States patent which preceded it. The three defendants rest their claim upon the theory that their predecessors in interest deeded the property to the predecessors in interest of the plaintiff for public cemetery purposes only and that, upon the abandonment of the cemetery the title to the property reverted to the three original grantors and that these defendants became entitled to an undivided one-third interest. The plaintiff contends that the predecessors of the defendants had no title at any time which they could convey for any purpose, and that if they had any equitable interest it was conveyed absolutely to the predecessors of plaintiff by deed which was not conditioned upon a trust for cemetery purposes.

Appellants' claim of title begins with a "preemption claim" by Kinzer recorded January 7, 1853. On April 9, 1853, Kinzer and wife conveyed to McCann. On April 8, 1854, McCann conveyed to Gray, Ranlett and Austin. On December 27, 1854, Ranlett conveyed to Atkinson. On July 10, 1856, Austin conveyed to Butler. On May 26, 1868, Gray, Atkinson and Butler conveyed to Laurel Hill Cemetery, a corporation. And on May 12, 1868, Austin and wife quitclaimed to the cemetery corporation. The question first arises whether these various grantees had any title which was subject to transfer.

The history of San Francisco land titles is to be found in numerous decisions of both the federal and state courts and does not require repetition. It is sufficient to summarize: At the end of the war between the United States and Mexico title to all lands in California was claimed to have vested in the United States. By the terms of the treaty of peace proclaimed July 4, 1848, the United States agreed to respect the property rights of the inhabitants. Included in this compact was the recognition of patents issued by the Spanish and Mexican Governments, and the settled doctrine of the Mexican law that each pueblo owned and was entitled to four

square leagues of land upon which it was located. Conformably on March 3, 1851, the Congress passed "An act to ascertain and settle the private land claims" which authorized the cities to present their claims to the public land commissioners for settlement. The city of San Francisco, on July 2, 1852, filed its petition for confirmation to it of four square leagues of "Pueblo Land." Prior to the consolidation of the city of San Francisco and the county of San Francisco much litigation arose involving title to these pueblo lands and to the "Outside Lands" which was settled in part by the act of the Congress of March 8, 1866 (14 U. S. Stats., p. 4) which declared that the "Outside Lands" should be held in trust by the city to be disposed of "and conveyed by said city to parties in the bona fide actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the State of California may prescribe. . . ." Pursuant to this act the municipality enacted an ordinance which was approved by act of the Legislature on March 27, 1868 (Stats. 1867-8, p. 379). The effect of this act was to confirm the right of the city and county to settle the title to all the "Outside Lands" in accordance with a map prepared for that purpose and to permit it to vest title in "the person, or to the heirs and assigns of persons, who were, on the eighth day of March, eighteen hundred and sixty-six, in the actual bona fide possession thereof, by themselves or their tenants" and who had, previous to the first day of April, 1868, paid "all taxes which have been assessed thereon during the five fiscal years preceding" July 1, 1866. Under the authority of this legislation the city deeded the property in dispute to Laurel Hill in June, 1871.

These facts stand undisputed: On March 8, 1866, respondent's grantor, Laurel Hill Cemetery Association, was in "actual bona fide possession" of all the land in dispute, and paid all the taxes assessed thereon. The appellants were not in possession, claimed no right of possession and are not shown to have paid any taxes upon the property since the year 1853. These conclusions necessarily follow: The four square leagues of the original Mexican pueblo never became a part of the public domain of the United States and were therefore not subject to preemption or settlement under the public settlement acts. The title to these lands passed to the

city and county of San Francisco, through the pueblo, under the terms of the treaty of Guadalupe Hidalgo and was confirmed to the city by United States patent. The deed of the municipality to Laurel Hill in 1871 passed clear title which by proper conveyances went to the respondent herein. The claim of appellants based upon an invalid claim of preemption, or "squatter's right" was void and valueless from its inception and never gained any validity through the passage of time. It is not necessary to burden the opinion with the citation of the numerous authorities in support of these propositions. It is sufficient to refer to *City and County of San Francisco* v. *Le Roy*, 138 U.S. 656 [11 S.Ct. 364, 34 L.Ed. 1096], where it was held that by the act of the Congress of March 8, 1866, and the decree of the court in *Grisar* v. *McDowell*, 6 Wall. (73 U.S.) 363 [18 L.Ed. 863], the title of the municipality was confirmed in the four square leagues of land as successor to the Mexican pueblo bounded on the east by the Bay of San Francisco, on the north and west by the Pacific Ocean and on the south by an east-west line coterminus with the city boundary. Thereby ". . . all the right and title of the United States to the land (with certain reservations not important here) . . . were relinquished and granted to the City, and the claim to the land was confirmed. . . ." The trust upon which the city held these lands, as successor to the Mexican pueblo, was "a public and municipal trust, to be exercised chiefly in the distribution of the lands to occupants and settlers . . . subject to the supervision and control of the legislative authority either of the State or of the United States." The "squatters" claim upon which the parties based their title was then rejected, the court saying: (34 L. Ed., p. 1100) "That claim of itself was of no value whatever, as the lands were not subject to pre-emption, not being lands of the United States, nor would they have been, even if owned by the United States, except under the Town-Site Act, because they were within the limits of what was then a town; but a large portion of the tract thus taken up was fenced in by Kissling, occupied by him, and a portion of it cultivated. His occupation was continuous during the whole period required by the ordinance to enable him to have the benefit of the transfer it made. He therefore acquired as complete a title in the interest which the City then held in the property as it was possible for the City to convey, under the Van Ness Ordinance and the confirmatory legislation of the State

and the United States." The same language is applicable here. The cemetery association's occupation was continuous during the whole period required by the statutes and by the city's deed the association acquired all the title which the city could possibly convey.

Conformably with these statutes, federal and state, and their confirmation by federal and state decisions, the city and county of San Francisco, on June 23, 1871, executed its deed to Laurel Hill Cemetery Association covering the entire tract in dispute. Such deed "like a patent, is *prima facie* evidence that the officers performed their duty in issuing it, and so, that it was issued to the rightful claimants." (*Galvin* v. *Palmer*, 113 Cal. 46, 53 [45 P. 172], and cases cited.) The argument in appellants' brief that there is a flaw in respondent's title because the city deed ran to Laurel Hill Cemetery, a corporation, whereas the corporation was not formed until after March 8, 1866, and hence could not have been in actual possession as required by the act of the Congress finds some ground in an affidavit attached to the complaint. But the deed is in evidence and this shows that the grantee was "Laurel Hill Cemetery Association."

For these reasons we hold that the appellants herein had no claim of any value upon which they could assert either a legal or an equitable interest in the property in suit.

■ Notwithstanding these settled rules the appellants insist that they have an interest, through the theory of possibility of reverter, because their ancestors "dedicated" the land to a public use which was abandoned when the owners were prohibited by law from continuing the occupation of the land for cemetery purposes. This they say follows because under the rules of the common law, which were then in force in this state, the "possibility of reverter" is not an "estate" and. could not be transferred. At the outset it should be noted that there is no evidence in the record that any of the conveyances made to the association contained any "dedicatory" language, or that they were other than outright grants of the full title, or, in the absence of "title," a complete assignment of all the possessory interest. And there is no evidence that at any period of its occupancy the cemetery represented to the public that it was a charitable organization or that it was anything but a simple commercial enterprise. From the day of the first "dedication" in 1854 the three owners, or claimants under the preemption

title, held themselves out as the "proprietors." Three other persons were named as "trustees," but the character and purpose of their trusteeship does not appear. It does appear, however, that when the association acquired the property from the "proprietors" in 1868 it paid them $25,000 for the property. Assuming as we must upon this record that the operation of the cemetery was from the beginning a commercial enterprise the authorities uniformly hold that there is no reversion when the use for cemetery purposes is abandoned, especially when the abandonment is compelled by statute or governmental agency. The authorities are reviewed in the opinion of the learned trial judge from which we quote, in part:

"A leading case is that of *Rawson* v. *Inhabitants etc. of Uxbridge,* 89 Mass. [7 Allen] 125 [83 Am.Dec. 670], which was a writ of entry to recover land in Uxbridge which had been used for cemetery purposes. The deed, made in 1737, is phrased in interesting pre-Revolution English. It contains the recital 'said land being improved for a burying place.' The habendum clause concludes 'to the said town of Uxbridge forever . . . for a burying-place forever.' Burials were conducted for many years, the last being about 1843. In 1860 the town sold the land to persons who removed the remains, changed the grade and appropriated the land for school purposes. An heir of the original grantor re-entered 'for breach of the condition of said deed.' In the trial court judgment went in her favor. It was reversed. . . .

"It was contended on the side of the re-entry that a condition could be implied from the deed. The question presented was whether there was, or was not, such condition.

"The opinion of Judge Bigelow examines the deed with great care. It goes into the English cases. It is particularly apposite for it is the declaration of a common-law court and the case presented the very question presented here, i. e., Whether *at common law* a 'possibility of reverter' remained in the grantor. It is interesting, moreover, because there, there were words in the deed which furnished some basis for argument that a condition was to be read into the deed or at least implied from it, while here both deeds are straight-out, unadorned grants. On top of all that, the opinion draws attention to the fact that a 'voluntary' donation is one thing while a transfer where a consideration is involved is quite another. . . .

*"Thornton* vs *Mayor of Natchez,* 129 F. 84 [63 C.C.A. 526] (5th C.C.A.) follows the able opinion in the Rawson case. It, too, stresses the commercial feature. 'A consideration of $500 was paid the grantors, and the grant was not made purely and exclusively from motives of charity or benevolence' says the court.

"In the Thornton case a reverter was claimed. The language in the deed was, to have and to hold the same 'for the uses and purposes of a burying place and so to be forever kept, used and enclosed in a decent and substantial manner and to and for no other use or purpose whatsoever.'

*"Field* vs *The City of Providence,* 17 R.I. 803 [24 A. 143], involved a rather elaborate deed 'for the sole purpose of a burying ground' and held 'on the authority of the carefully considered case' of *Rawson vs Uxbridge,* supra, that the deed in question 'carried an absolute estate in fee simple to the grantees, and therefore the petitioner has no claim for any reversionary or resulting right in the land conveyed.' The fact that the grantees paid 'one hundred and twenty Spanish milled dollars' for the property 'which does not appear to have been less than its full value' weighed, of course, with the court.

"The court concluded as in the Rawson and Thornton cases that this was simply a business deal.

"The Rawson and Thornton cases have been cited with approval, and followed in numerous instances and in many jurisdictions.

"No case has been cited by the defendants supporting their contention that at common law a reversion would be read into a grant where the instrument was silent respecting a condition subsequent particularly where the transaction was an ordinary business transaction where the grantor sold his land and was paid a consideration therefor. In the cases just discussed the deeds were not entirely silent, but the courts nevertheless held against a reverter. . . .

"The Victoria Hospital case, 169 Cal. 455 [147 P. 124], cited by the defendants is as strong as the Rawson case (if not stronger) in what it says respecting conditions subsequent. The deed which was involved in that case contained an habendum clause with an 'express condition',—which was so denominated—but nothwithstanding that, the court held against the contention that it created a condition subsequent. See discussion commencing with 'It is, of course, a familiar

principle that such conditions are not favored in law because they tend to destroy estates, and that no provision in a deed relied on to create a condition subsequent will be so interpreted if the language of the provision will bear any other reasonable construction.' This is substantially what was said in the Rawson case, supra. . . .

"The case of *Board of Commisisoners of Mahoning County* vs *Young*, 59 F. 96 [8 C.C.A. 27] (6th C.C.A., 1893) is directly in point. . . .

"The opinion is interesting because of the full discussion found therein of the authorities holding that a condition subsequent and the retention of a right of re-entry will be found only if it clearly appears from the deed that such was the intention. The discussion on this score is much the same as that found in the Rawson case.

"The opinion is interesting, moreover, because it holds very definitely that whenever burials are prohibited by law such forced termination of the cemetery use will not be treated as a breach of condition or give rise to a right of re-entry. In other words, the further performance of the condition is excused because of the intervention of the law. . . .

"The Youngstown case [supra], 59 F. 96, has been cited and followed many times. *Hopkins* vs *Grimshaw*, supra, cited by the defendants, not only cites the Rawson case several times but (at 165 U.S. [342] 355 [17 S.Ct. 401, 41 L.Ed. 739]) it cites this case as well, as a case turning 'upon a question of forfeiture for breach of a condition subsequent in a deed to a municipal Corporation.'

"In *Wright* vs *Morgan*, 191 U.S. 55, 58 [24 S.Ct. 6, 48 L.Ed. 89], Justice Holmes cites the Youngstown case. In his opinion he says: 'If the legal title was in the city (Denver) it was an absolute title. In view of the extreme unwillingness of courts to admit the existence of a common law condition, even when the word condition is used, it needs no argument to show that there was no condition or limitation here. *Stuart* vs *Easton*, 170 U.S. 383 [18 S.Ct. 650, 42 L.Ed. 1078]. . . . We should require the clearest expression of such an unusual restriction before we should admit that it was imposed, especially in an ordinary sale for cash.'

"In *Columbia etc. Co.* vs *State of South Carolina*, 261 U.S. 236 [43 S.Ct. 306, 67 L.Ed. 629] the Youngstown case is cited and followed. At page 250 Justice Sutherland says: 'When . . . we consider all the circumstances, including the

fact that the sale to the defendant was absolute and for a valuable consideration, that there are no express terms creating a condition, no clause of re-entry nor words of any sort indicating such purpose, the conclusion is unavoidable that the obligation in question is a covenant and not a condition subsequent. *Board of Commissioners* vs *Young* [*supra*], 59 F 96' Immediately following this there is a lengthy quotation from the Young case at page 105 of Fed. Rep.

"In *Kibbe* vs *City of Rochester,* 57 F.2d 542, 545, the Youngstown case is again cited and followed.

"In *U.S.* vs *2,086 Acres of Land, etc.,* 46 F.Supp. 411, 413, the Youngstown case is cited and followed on the point that forfeiture of an estate granted on a condition subsequent is excused when the grantee later is precluded by law from using the property for the purpose designated.

"Indeed the Youngstown case has been cited and followed by our own Supreme Court. In the case of *Gramer* vs *City of Sacramento,* 2 Cal.2d 432, 439 [41 P.2d 543], Justice Thompson says: 'We find in *Board of Commrs.* v. *Young,* 59 F. 96-105 [8 C.C.A. 27], a pertinent statement, as follows: "Too little weight has been given to the fact that the deed was upon a valuable consideration; to the fact that it was a quitclaim of all right, title and interest; to the fact of a previous common-law dedication; and to the failure, under such circumstances, to make the title subject to an express right of re-entry." ' "

We are in full accord with these views and therefore hold that, if the appellants' predecessors had any claim based upon the "squatters" rights it was completely lost through their transfers of all their interests to the predecessors of respondent.

Finally it is argued that the court was without jurisdiction to proceed with the trial because all other persons who had appeared in former actions involving the same property had not been served, as required by section 14 of the act. (Stats. Ex. Sess., 1906, p. 78, as amended; Deering's Gen. Laws, Act 1026.) The purpose of the section was to prevent fraud upon those who had title or interest in the property. (See *Westover* v. *Stanley,* 93 Cal.App. 113 [269 P. 475].) But, insofar as appellants are concerned the action as to them became an action to quiet title. This being an equitable action, and the court having jurisdiction of the subject matter of the controversy—the question of title be-

tween these parties—it had full jurisdiction to complete the litigation and render a judgment quieting the title as between the parties who put that title in issue. See *Faxon* v. *All Persons*, 166 Cal. 707, 712 [137 P. 919, L.R.A. 1916B 1209], and cases there cited.

Judgment affirmed.

Sturtevant, J., and Dooling, J. pro tem., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 12, 1945.