BRANSON SCHOOL DISTRICT RE–82, Pritchett School District RE–3, Springfield Public Schools District RE–4, and Kandace Sue Spurling and Brooke Ilene Spurling, by and through their parents David Earl and Lona Sue Spurling, Plaintiffs,

v.

Roy ROMER, Governor of the State of Colorado, and Robert Mailander, Thomas W. Swanson, and Charles A. Vidal, in their official capacity as members of the Colorado State Board of Land Commissioners, Defendants.

Civil Action No. 96–B–2979.

United States District Court,
D. Colorado.

March 26, 1997.

Charles E. Mortimer, Jr., Evan S. Lipstein, Lakewood, CO, John Berry, Denver, CO, for Plaintiffs.

Gale Norton, Colo. Atty. Gen., Patricia Bangert, Asst. Atty. Gen., Denver, CO, for Defendants.

## MEMORANDUM OPINION & ORDER

BABCOCK, District Judge.

Plaintiffs seek to enjoin the enforcement and implementation of Amendment 16 to Article IX of the Colorado Constitution (Amendment 16), adopted by the people of Colorado at the November 5, 1996, general election. On December 26, 1996, I entered a Temporary Restraining Order, restraining defendants from implementing Amendment 16. On January 15, 1997, after hearing, I dissolved the temporary restraining order and issued a preliminary injunction against enforcement of only section (9)(5) of Amendment 16. The parties have filed and argued their cross-motions for summary judgment. For the following reasons, I will grant the defendants' motion for summary judgment and deny the plaintiffs' motion for summary judgment.

### I.

The facts are undisputed and uncomplicated, but the legal issues they raise are numerous and difficult. In 1875 the United States Congress passed the Colorado Enabling Act, 18 Stat. 474, authorizing the inhabitants of the Territory of Colorado to form a state. Section 7 of the Act grants sections 16 and 36 of every township to Colorado "for the support of the common schools." Section 14 states that these school lands are to be disposed of only at public sale and provides for the proceeds of such sales to be placed in a "permanent school-fund," the interest on which to be expended in support of the common schools.

In its original constitution, the State of Colorado placed the school lands in an explicit trust for the benefit of public schools.

Amendment 16 alters many of the terms of that trust. Plaintiffs, three Colorado school districts and two public school children, argue that these changes will result in less money to the school lands fund. To that extent, plaintiffs allege that Amendment 16 conflicts with the Colorado Enabling Act, thereby violating the Supremacy Clause of the United States Constitution. U.S. Const. Art. VI, ¶ 2.

### II.

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment is appropriate where there are no genuine issues of material fact, and one party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III.

The parties raise the following discrete issues: (1) whether the plaintiffs have standing to bring this suit; (2) whether the Eleventh Amendment to the United States Constitution bars the plaintiffs' claim; (3) whether the Colorado Enabling Act creates an enforceable trust in favor of public schools or a compact between the State of Colorado and the United States; and (4) whether Amendment 16, on its face, comports with the requirements of the Colorado Enabling Act. I will address these issues in turn.

#### A. *Standing*

The defendants challenge plaintiff's standing to bring this suit on three grounds: (1) political subdivisions do not have standing to sue the state; (2) the plaintiffs' alleged injury is too speculative to create standing; and (3) the Colorado Enabling Act does not create a private right of action. Although the third argument is not framed as a standing question, I will address it as such because it essentially challenges the plaintiffs' right to bring this case.

### 1. Political Subdivision Standing

The defendants argue that the school district plaintiffs have no standing to sue for an injunction against a state constitutional provision. According to the defendants, the school districts are political subdivisions of the state, existing "only for the convenient administration of state government." Deft. Br. at 6 (citing *Romer v. Board of County Comm'rs*, 897 P.2d 779, 782 (Colo.1995)). As such, defendants contend, the school districts are part of the state, and allowing them to sue the state is tantamount to the state suing itself.

■ The first issue is whether federal or state law applies to this question. The defendants argue that only state law applies. I disagree. Whether a party is a political subdivision of a state is a question of state law. *City of Moore, Oklahoma v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 511 (10th Cir.1983) (citing *City of Tulsa v. Wheetley*, 187 Okl. 155, 101 P.2d 834 (1940)). However, whether a political subdivision has standing in federal court to challenge the federal constitutionality of an amendment to a state constitution, is a question of federal law. *See id.* at 512 (citing *City of New York v. Richardson*, 473 F.2d 923 (2d Cir.), *cert. denied, Lavine v. Lindsay*, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973) and other federal cases). Accordingly, the state law cases cited by defendants are not controlling, except that the Colorado courts have conclusively stated that Colorado school districts are political subdivisions of the state. *See Bagby v. School Dist. No. 1*, 186 Colo. 428, 528 P.2d 1299, 1302 (1974).

■ Whether a political subdivision suing under the Supremacy Clause of the United States Constitution has standing to challenge a state constitutional amendment is an issue of first impression in this circuit. The Tenth Circuit has previously stated that political subdivisions do not have standing to challenge state statutes on Fourteenth Amendment grounds. *See City of Moore, supra* at 511–12; *Housing Authority of the Kaw Tribe of Indians of Oklahoma v. City of Ponca City*, 952 F.2d 1183, 1188 (10th Cir.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). *City of Ponca City* includes some broad dicta stating that "[i]t is well established that a political subdivision may not lodge constitutional complaints against its creating state." 952 F.2d at 1188. However, all of the cases cited and the facts of that case involved alleged violations of the Fourteenth Amendment. According to my review of the cases, the Tenth Circuit has never squarely addressed whether that rule extends to actions premised on the Supremacy Clause.

The Supreme Court has also stated that a political subdivision may not sue its creating state on Fourteenth Amendment grounds. *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933). However, several courts have distinguished between claims premised on individual rights (such as those arising under the Fourteenth Amendment) and claims based on the Supremacy Clause, finding standing appropriate for the latter. *See, e.g., Rogers v. Brockette*, 588 F.2d 1057, 1067–71 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979); *Santiago Collazo v. Franqui Acosta*, 721 F.Supp. 385, 393 (D.P.R.1989). The cogent rationale of this line of cases is summarized in *San Diego Unified Port District v. Gianturco*, 457 F.Supp. 283, 289–90 (S.D.Cal.1978), *aff'd on other grounds*, 651 F.2d 1306, 1309, n. 7 (9th Cir.1981):

> The reason for distinguishing between constitutional challenges based on the Supremacy Clause and challenges based on other constitutional provisions lies in the purpose of the Supremacy Clause. The Supremacy Clause mandates that "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const., Art. VI, cl. 2. This provision forbids state regulation which conflicts with federal law. It establishes a structure of government which defines the relative powers of states and the federal government. ...

> Other constitutional provisions, unlike the Supremacy Clause, ... confer fundamental rights on individual citizens. The Fourteenth Amendment, for example, guarantees that all citizens enjoy equal protection of the laws and due process of law. These

are not structural limitations on government power in the Supremacy Clause sense, but they are rights given to individual citizens which limit governmental power generally. Such rights accrue to individual citizens, not to units of government. Consequently, political subdivisions have no legitimate basis for asserting constitutional rights which are intended to limit governmental action vis-a-vis individual citizens.

If the Supremacy Clause is to be effective in achieving its purpose, its dictates must be enforceable by political subdivisions of states as well as by individuals. Political subdivisions can be profoundly affected by state action which conflicts with federal law. If political subdivisions were prevented from challenging preempted state legislation and regulation, such legislation and regulation often would go unchecked even though expressly prohibited by the Constitution.

I agree. Unlike the Fourteenth Amendment, there is no support for the proposition that the Supremacy Clause may be enforced only by private parties. Neither the Constitution nor case law demands it, and logic refutes it.

The only case to the contrary cited by defendants is *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231 (9th Cir.), *cert. denied,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980). There, the plaintiffs brought claims under the Fifth and Fourteenth Amendments and the Supremacy Clause. *Id.* at 232. The court stated that because the plaintiff was a political subdivision of the state, it did not have standing to sue the state. *Id.* at 233. I am not persuaded.

*South Lake Tahoe* cites only cases involving Fourteenth Amendment claims and does not discuss, even in passing, whether Supremacy Clause claims should be treated differently. *Id.* at 233–34. In dissenting from a denial of *certiorari* in *South Lake Tahoe,* Justice White, joined by Justice Marshall, stated that a "per se rule" against political subdivisions maintaining claims against their creating states "is inconsistent with [*Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) ], in which one of the appellants was a local board of education. Furthermore there is a conflict in the Circuits over the validity of such a rule." 449 U.S. 1039, 1042, 101 S.Ct. 619, 621, 66 L.Ed.2d 502 (1980).

Moreover, in affirming *Gianturco, supra,* the Ninth Circuit itself cast doubt on the breadth of *South Lake Tahoe:* "While there are broad dicta that a political subdivision may never sue its maker on constitutional grounds [citing the Ninth Circuit's *South Lake Tahoe* opinion], we doubt that the rule is so broad [citing Justice White's dissent from denial of *certiorari, Allen, supra,* and *Rogers, supra* ]" 651 F.2d 1306, 1309–10, n. 7 (9th Cir.1981). Although the Ninth Circuit recently stated it was bound by *South Lake Tahoe* to hold that a political subdivision may bring no constitutional claims against its creator state, it did so reluctantly. In *Indian Oasis–Baboquivari Unified School District No. 40 v. Kirk,* 91 F.3d 1240, 1242–43 (9th Cir.1996), *rehearing en banc granted,* 109 F.3d 634 (9th Cir.1997) (dismissing appeal for lack of jurisdiction), the court recognized the rationale of *Rogers* and *Gianturco, supra,* but stated that it did not have the power to overturn *South Lake Tahoe* without an *en banc* decision: "We must follow *South Lake Tahoe*—right or wrong—unless intervening authority undermines the decision."

Therefore, although the Ninth Circuit now has a blanket rule prohibiting political subdivisions from bringing constitutional claims against its creator state, it has never explained the rationale for such a per se rule. In addition, the weight of authority and sound analysis by other courts indicate that political subdivisions should have standing to challenge state laws for Supremacy Clause violations. Accordingly, I conclude that the school district plaintiffs, though political subdivisions under Colorado law, are not precluded under federal law from having standing due to their status as subdivisions.

2. Concrete Injury

■ The defendants argue that the plaintiffs lack standing because they have not alleged a concrete personal injury that is fairly traceable to the challenged conduct and likely to be redressed by the requested relief.

*See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982). Specifically, defendants contend that plaintiffs' injury is speculative because it assumes that Amendment 16 will result in less money for the public schools.

The parties agree that only a small percentage of each school district plaintiff's budget comes from the sale and management of school lands. The rest is allocated on a yearly basis by the Colorado General Assembly. The defendants argue (1) there is no evidence that the implementation of Amendment 16 will result in less revenue for schools from school lands, and (2) even if it does, there is no evidence that any shortfall would not be made up by the General Assembly. I am not persuaded.

Defendants' first contention goes essentially to the merits of the claim brought by plaintiffs. As will be discussed, plaintiffs' claim depends on whether Amendment 16 changes the duties of the State of Colorado and its officials such that the plaintiffs would be materially disadvantaged. The sensitive question of standing should not turn on the defendants' clever posit of the age-old chicken/egg conundrum. Accordingly, I cannot agree that the defendants' argument on the merits alone precludes the plaintiffs from arguing the substance of their case.

■ Defendants' second argument is a more interesting one. Defendants contend that the actual revenues received by plaintiffs depends in large part on the discretionary actions of others—namely the Colorado General Assembly and the buyers and lessees of school lands. To the extent defendants speculate that revenues from school lands may not go down because buyers and lessees of school lands may be willing to pay just as much or more for school lands after Amendment 16 is implemented, it is an argument on the merits, and I am not convinced for the reasons stated above that standing should be thereby denied. The possibility that the General Assembly may make up any shortfall, however, cannot be ignored, and it is plaintiffs' burden to show standing.

In *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), a plurality of the Supreme Court held that both state taxpayers and the Arizona Education Association lacked standing to challenge the validity of a statute regulating mineral leases on school lands. The claims were premised on the allegation that a state statute regulating mineral leases on school lands violated the Supremacy Clause because it conflicted with the Arizona–New Mexico Enabling Act. The taxpayers argued that if the state statute was invalidated, schools would receive more money and their taxes would go down. The Arizona Education Association, a group of over 20,000 public school teachers, argued that if the state statute was invalidated, it would result in more money for schools, which would benefit them, presumably financially.

The Supreme Court split on the question whether the taxpayers and the teachers association had standing to challenge the statute. In an opinion authored by Justice Kennedy, a plurality of four justices stated that neither group had standing. In particular, Justice Kennedy reasoned that even if the money raised by leases on school lands increased the school trust fund, there was no guarantee that either taxpayers or teachers would be better off if they prevailed:

If they were to prevail, it is conceivable that more money might be devoted to education; but since education in Arizona is not financed solely from the school trust fund, the State might reduce its supplement from the general funds to provide for other programs. The possibility that taxpayers will receive any direct pecuniary relief from this lawsuit is "remote, fluctuating and uncertain," as stated in [*Frothingham v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) ] and consequently the claimed injury is not "likely to be redressed by a favorable decision," *Valley Forge,* supra, at 472 [102 S.Ct. at 758]. . . .

The same flaw defeats the claim that the teachers association would have had standing to bring this suit originally in federal court. . . . If respondents prevailed and increased revenues from state leases were

available, maybe taxes would be reduced, or maybe the State would reduce support from other sources so that the money available for schools would be unchanged.... Whether the association's claims of economic injury would be redressed by a favorable decision in this case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.

*ASARCO, supra* at 614–15, 109 S.Ct. at 2044.

Four other justices, in an opinion by Justice Brennan, concurring in part and concurring in the judgment, stated that they disagreed with the conclusion that the two groups lacked standing, particularly the teachers association. *Id.* at 633, 109 S.Ct. at 2053–54. Justice Brennan, however, did not explain his reasons for objecting to the conclusion of Justice Kennedy's opinion regarding the plaintiffs' standing because he concluded that the Court need not reach that issue. Regardless whether the original plaintiffs had standing when the case was filed, a majority of the Court stated that the plaintiffs now had standing because the decisions made below by the trial and appeals courts created a justiciable case or controversy. *Id.* at 624, 109 S.Ct. at 2049. Therefore, we are left to wonder as to the reasons Justice Brennan and three others believed standing to be proper from the outset.

In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561–62, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992), the Court further expanded on the question of standing for parties who challenge government regulation of third parties. In an opinion joined in pertinent part by six justices, the Court stated:

When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation ... of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated ... third party to the government action ...—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *ASARCO Inc. v. Kadish,* [*supra*] ... and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.... Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

Id. at 561, 112 S.Ct. at 2137 (other internal citations omitted) (emphasis in original).

Arguably, *ASARCO* and *Lujan,* read together, indicate that the plaintiffs lack standing here. Plaintiffs are not regulated directly by Amendment 16. Rather the members of the land board and, to a certain extent, the Governor are regulated. Therefore, the heightened scrutiny for standing set forth in *Lujan* applies. As in *ASARCO,* there is no guarantee that the plaintiffs will be better off if they win because the school trust lands are not their only source of state income, in fact they are not even a major source. I conclude, however, that plaintiffs have standing.

*ASARCO* is a plurality opinion in which the Court was evenly divided over whether the plaintiffs had standing, and it is, therefore, not controlling. As for *Lujan,* it does not adopt *ASARCO* fully, but only the rationale that if intervening parties have unfettered discretion to obviate whatever relief is fashioned by the court, there is no standing. That is not the case here. Rather, if plaintiffs prevail and show that the school fund

will generate less money, they get less money from that fund. Additional funding by the Colorado General Assembly is a distinct issue, and the state cannot circumvent the United States Constitution simply by lumping its support from general funds in with the monies specifically earmarked, segregated in trust, and directed by Congress to go to the support of the common schools. Enabling Act § 14.

In *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), the plaintiffs were Mississippi school districts who claimed that the uneven distribution of money generated by school lands was a violation of the Equal Protection Clause. Three dissenting justices stated that they would have dismissed the claim as de minimus because the school lands provided only a very small percentage of the overall funding for school districts. *Id.* at 300, 106 S.Ct. at 2951–52 (Powell, J. dissenting). The majority specifically rejected that argument, looking instead at the school lands fund in isolation. *Id.* at 288, n. 17, 106 S.Ct. at 2946, n. 17. The majority recognized that the state itself separated this program from other sources of public school funding in administration and accounting. *Id.*

Although the Court was not specifically confronted with a standing issue, the parallel is a close one. *But see, United States v. Los Angeles Tucker Truck Lines, Inc.,* 344 U.S. 33, 38, 73 S.Ct. 67, 69–70, 97 L.Ed. 54 (1952) (stating that the exercise of jurisdiction in a case where jurisdiction is not expressly considered is not precedent for the existence of jurisdiction). Unlike *ASARCO,* there was a majority for this part of the Court's opinion in *Papasan.* In addition, the facts of *Papasan* are considerably more relevant here than those in *Lujan.* School land funds in Colorado have not been commingled with the general treasury, pursuant to the Colorado constitution, which has stated since 1875 that the permanent school-fund shall "forever remain inviolate." Colo. Const. Art. IX § 3. Therefore, in my view, money lost from the permanent school-fund is a separate and cognizable injury, and plaintiffs have standing.

### 3. Private Right of Action

■ Defendants' argument that plaintiffs may not maintain this action because the Colorado Enabling Act does not create a private right of action is unavailing because this case arises under the Supremacy Clause of the United States Constitution. The genesis of plaintiffs' case is that by implementing a state constitutional measure that contradicts the terms of the Colorado Enabling Act, the defendants have violated the United States Constitution. Therefore, it is irrelevant whether the Enabling Act itself creates a private right of action, as private parties are clearly permitted to maintain actions based on the Supremacy Clause.

### B. *Eleventh Amendment*

■ The Eleventh Amendment provides that a plaintiff may not sue the state absent consent by the state or an abrogation of the Eleventh Amendment by Congress pursuant to a valid exercise of legislative power. *Seminole Tribe of Florida v. Florida,* — U.S. —, —, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Such valid exercises of congressional power include acts passed under § 5 of the Fourteenth Amendment and the Commerce Clause of Article I, § 8. *Id.* (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976); *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989)). Colorado has not consented to suit here. In addition, there is no indication that Congress has abrogated Eleventh Amendment immunity with relation to a claim arising under the Supremacy Clause in conjunction with the Colorado Enabling Act under any source of its legislative power. Accordingly, the Eleventh Amendment immunity bars any actions against the State of Colorado.

Plaintiffs originally sued the Colorado State Board of Land Commissioners (Board), which is a state agency. *Sunray Mid–Continent Oil Co. v. Colorado,* 149 Colo. 159, 368 P.2d 563, 564–65 (Colo.1961). A suit against a state agency is a suit against the state. Recognizing this, plaintiffs moved to substitute the individual members of the Board as defendants in place of the Board. The defendants had no objection, and I granted that

motion. Governor Romer, who was an original defendant, and the individual board members are sued only in their official capacities. Suits against government officials in their official capacity are also considered suits against the state. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).

■ Plaintiffs rely on *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which provides that the Eleventh Amendment immunity does not apply to claims for ongoing violations of federal law brought against state officials acting in their official capacities for prospective injunctive relief. Defendants argue, however, the exception of *Ex Parte Young* does not apply to Governor Romer because Governor Romer is not responsible for implementing Amendment 16. According to the text of Amendment 16, Governor Romer's only responsibilities are to proclaim Amendment 16 effective and to appoint members of the Board with the advice and consent of the Senate. Governor Romer has already proclaimed Amendment 16 effective, so his only remaining responsibility is to appoint new or replacement Board members. Defendants argue that because the appointment of Board members is not, in itself, a violation of the Colorado Enabling Act, there is no ongoing violation of federal law to enjoin, and *Ex Parte Young* is inapplicable. *See Johns v. Stewart,* 57 F.3d 1544, 1552 (10th Cir.1995).

I am not persuaded that the Eleventh Amendment shields Governor Romer from suit here. Although it is true that the doctrine of *Ex Parte Young* applies only to ongoing violations of federal law, a plaintiff need not prove the merits of its case to escape the threshold question of Eleventh Amendment immunity. *Johns, supra,* does not require it. Rather, so long as the suit seeks to enjoin an *alleged* ongoing violation of federal law by a state official acting in an official capacity, *Ex Parte Young* abrogates Eleventh Amendment immunity. Otherwise, federal courts would be forced into the circular process of considering the merits of a case to determine whether it should consider the merits of the case.

Therefore, I will not dismiss plaintiffs' claim against any defendant on Eleventh Amendment grounds.

### C. Rights and Duties Created by the Colorado Enabling Act

■ The defendants argue that the Colorado Enabling Act created no binding duties on the State of Colorado because (1) the "equal footing doctrine" precluded Congress from placing conditions on the management of Colorado's lands and (2) the language of the Act does not create a trust or binding compact between the United States and Colorado concerning the management of school lands. Accordingly, defendants contend that plaintiffs have no cause of action on which to sue. I disagree.

### 1. Equal Footing Doctrine

The defendants argue that restricting the disposition or management of school lands in any way via the Enabling Act would violate the "equal footing doctrine." According to the equal footing doctrine,

> [E]ach state is "equal in power, dignity, and authority," and ... a state's sovereign power may not be constitutionally diminished by any conditions in the acts under which the State was admitted to the Union; any conditions imposed by Congress "would not operate to restrict the State's legislative power in respect to any matter which was not plainly within the regulating power of Congress."

*Potter v. Murray City,* 760 F.2d 1065 (10th Cir.), *cert. denied,* 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985) (quoting *Coyle v. Smith,* 221 U.S. 559. 573–74, 31 S.Ct. 688, 692–93, 55 L.Ed. 853 (1911)). Defendants argue that imposing trust obligations on the State of Colorado with regard to the school lands would place Colorado on unequal footing with its sister states, particularly the original thirteen, which are not subject to any enabling act. Therefore, defendants contend the Enabling Act is unconstitutional to the extent it places any restrictions on Colorado's use of its school lands. I disagree.

First, the Supreme Court has considered and enforced school lands provisions of simi-

lar enabling acts for decades without even a mention of the equal footing doctrine. *See, e.g., Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *Ervien v. United States,* 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919). Perhaps believing that they have stumbled upon a legal theory that has escaped the attention of nearly a century of litigants and Justices, however, the defendants argue that the Court's silence on this issue leaves the question open for discussion. Therefore, out of an abundance of caution, I will address it.

I begin with the history of the enabling acts of the western states, as summarized in *Andrus v. Utah,* 446 U.S. 500, 520–24, 100 S.Ct. 1803, 1813–16, 64 L.Ed.2d 458 (1980) (Powell, J. dissenting). When the original thirteen states formed the Union, each state had sovereign authority over the lands within its borders. Such lands created a tax base for the support of education and other government activities. When settlers in what is now Ohio sought statehood within a portion of the Northwest Territory in 1802, they encountered a different situation. Large portions of the proposed state belonged to the federal government. Accordingly, unless the federal government waived its immunity from taxation, the new state would not have an adequate tax base.

"In order to place Ohio on equal footing with the original States, Congress enacted a compromise." *Id.* at 522, 100 S.Ct. at 1815. The compromise set a pattern followed in the admission of virtually every subsequently created state, excepting only Maine, Texas, West Virginia, and Hawaii. Although the specific details varied from state to state, the elements of the plan remained constant. "As consideration for each new State's pledge not to tax federal lands, Congress granted the State a fixed proportion of the lands within its borders for the support of public education." *Id.* at 523, 100 S.Ct. at 1815. "These agreements were solemn bilateral compacts between each State and the Federal Government." *Id.*

Because the intent of the federal grant of school lands was to put the western states on equal footing with the original thirteen, it cannot follow that the grants violated the equal footing doctrine. Logic dictates that the defendants' argument must fail.

Moreover, it is undisputed that the federal government, as sovereign, owned in fee simple the land that was eventually granted to Colorado for the support of the common schools. The federal government was under no obligation to grant such land to the new state. The United States could have reserved entirely any portion of the proposed State of Colorado from the Enabling Act grant. *See* U.S. Const. Art. IV § 3 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ...").

The federal government has a long history of maintaining ownership and control of lands within state borders for its own use. *See, e.g., United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); *United States v. Wyoming,* 331 U.S. 440, 448, 67 S.Ct. 1319, 1323–24, 91 L.Ed. 1590 (1947). Given this plenary power, therefore, the federal government had the power to grant something less than a fee simple interest in school lands to Colorado (i.e., school lands subject to trust). Because the United States had the power to grant nothing at all, it had the power to grant some but not all of its fee simple interest to the newly created state.

■ In addition, the terms of the doctrine as articulated in *Coyle, supra,* preclude limiting state legislative power only to the extent it is beyond the power of Congress. For example, in *Coyle,* the Court held that a provision of Oklahoma's Enabling Act requiring the state capital to be located in Guthrie was an invalid infringement on state legislative power not incurred by other states. The United States Congress simply had no power under the Constitution to mandate the location of Oklahoma's capital. That holding is inapposite here.

For the purposes of this equal footing analysis, I assume that, by the terms of the

Enabling Act, the United States granted the school lands to Colorado in trust for the benefit of public schools in Colorado. Congress had the right to grant as much or as little of federal lands as it wished to Colorado. Accordingly, I am not persuaded that the enforcement of the requirements set forth in the Enabling Act violates the equal footing doctrine.

2. Creation of a Trust or Binding Compact

 The defendants contend that even if restrictions on management of school lands would not violate the equal footing doctrine, Colorado's Enabling Act, by its terms, creates no binding obligations on the State of Colorado. Rather, defendants contend that the Act creates only an "honorary" obligation to use the lands in question for the benefit of the schools. The defendants argue, therefore, that the trust is a creature only of Colorado's Constitution, which has recently been amended to revise the trust, and bears no allegiance to the Supremacy Clause. I disagree.

The Supreme Court has a long, albeit somewhat inconsistent, history of interpreting grants of school lands made in enabling acts. In *Cooper v. Roberts*, 59 U.S. 173, 181–82, 18 How. 173, 15 L.Ed. 338 (1855), for example, the Court approved the sale of school lands granted to Michigan under its enabling act, stating that "the grant is to the State directly, without limitation of its power, though there is a sacred obligation imposed on its public faith." Similarly, in *Alabama v. Schmidt*, 232 U.S. 168, 173–74, 34 S.Ct. 301, 302–03, 58 L.Ed. 555 (1914), the Court concluded that, with regard to school lands, "[t]he gift to [Alabama] is absolute, although, no doubt, as said in Cooper, 'there is a sacred obligation imposed on its public faith.' But that obligation is honorary...." *See also Stuart v. Easton*, 170 U.S. 383, 394, 18 S.Ct. 650, 654, 42 L.Ed. 1078 (1898) ("the mere expression of a purpose will not of and by itself debase a fee." (internal quotes omitted)).

On the other hand, more recent Supreme Court cases interpreting later enabling acts have concluded that explicit trust obligations were created. For example, a series of cases interpreting the Arizona–New Mexico en-

abling act all held that the enabling act created a binding trustee-beneficiary relationship between the state and its public schools. *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *Lassen v. Arizona*, 385 U.S. 458, 460–61, 87 S.Ct. 584, 585–86, 17 L.Ed.2d 515 (1967); *Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919). The Court has recognized the inconsistency of its decisions:

> Thus, the Court has indicated that some school lands grants did not create express trusts and has held that other grants did create such trusts.... The Court has never discussed the relationship between these two sets of cases, but it is possible that any variation in results stems from the facts that the terms of the grants have varied over time.... Thus, it could be that the earlier grants did give the grantee States absolute fee interests, while the later grants created actual enforceable trusts. On the other hand, it may be that ... the substance of all of these grants is the same. See S.Rep. No. 454 61st Cong., 2d Sess., 18–20 (1910) (referring to express trust provisions in New Mexico and Arizona Enabling Act as "nothing new in principle," and noting that "[f]or many years it has been the custom to specify the purposes for which grants of lands are made to incoming states and to place express restrictions upon the mode of disposing of them"). Or perhaps they are all properly viewed as being in the nature of "a 'solemn agreement' which in some ways may be analogized to a contract between private parties." *Andrus v. Utah*, [supra at 507, 100 S.Ct. at 1807]. Perhaps, then, the conditions of the grants are still enforceable by the United States, although possibly not by third parties.

*Papasan v. Allain*, 478 U.S. 265, 289 n. 18, 106 S.Ct. 2932, 2946 n. 18, 92 L.Ed.2d 209 (1986).

The defendants argue that the Court's first explanation is correct—the Arizona–New Mexico Enabling Act creates a binding trust where earlier acts do not because its language is more specific, explicitly employing the word "trust." Further, defendants contend that the Colorado Enabling Act is more

like the earlier enabling acts of Michigan and Alabama because it does not employ the word "trust" or provide for any particular duties with regard to management of the lands. Accordingly, under *Schmidt* and *Cooper*, defendants argue that the language in the Colorado Enabling Act relating to "support of the common schools" is merely precatory, and plaintiffs' claim must fail. I disagree that plaintiffs' claim must fail for this reason.

"The starting point of any consideration of this question must be the federal grants themselves, for it is clear that the interest transferred to the State depends on the federal laws that transferred that interest." *Papasan, supra,* at 289, n. 18, 106 S.Ct. at 2946, n. 18. The Colorado Enabling Act, as the defendants point out, does not use the word "trust" in relation to school lands. Two sections of the Act pertain to school lands. Section 7 states:

> The sections numbered sixteen and thirty-six in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands, equivalent thereto, in legal subdivisions of not more than one quarter-section, and as contiguous as may be, are hereby granted to said State for the support of common schools.

By contrast, the Arizona–New Mexico enabling act includes specific trust language. For example, that act states that the lands granted "shall be by the State held in trust, . . . and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same." *See Lassen, supra,* at 470, 87 S.Ct. at 590 (appendix). In addition, the Arizona–New Mexico Enabling Act section regarding school lands is considerably longer and more detailed than the Colorado Enabling Act. Therefore, as the Supreme Court in *Papasan* recognized, it is clearly more difficult to conclude that the less specific words of a statute such as Colorado's Enabling Act creates binding obligations on the state in its management of school lands. However, I am persuaded that such binding obligations exist.

Although section 7 of the Colorado Enabling Act is similar to the enabling acts of Michigan and Alabama considered in *Cooper* and *Schmidt,* neither of these states' acts included language parallel to that of section 14 of the Colorado Act. *See* 3 Stat. 489, 491 § 6 (1819) (Alabama) (granting section sixteen in every township "for the use of schools"); 9 Stat. 146 § 2 (1847) (Michigan) (reserving section sixteen in each township "for the use of schools").

Section 14 of the Colorado Enabling Act provides:

> That the two sections of land in each township herein granted for the support of common schools shall be disposed of only at public sale and at a price not less than two dollars and fifty cents per acre, the proceeds to constitute a permanent school-fund, the interest of which to be expended in support of common schools.

This language is specific and mandatory. It is understandable that the Court would not recognize a trust created only by the words "for the use of schools." Ordinary trust principles require the use of specific language evincing an intent on the part of the settlor to create a trust with enforceable duties. *Restatement (2d) of Trusts* § 25. Colorado's Act would, however, appear to be a hybrid between the earlier, precatory acts of Alabama and Michigan, and the more specific act of Arizona–New Mexico. The question then becomes on what side of the line should the Colorado Enabling Act be placed. I hold that it creates an enforceable trust.

I am aided in my conclusion by the Supreme Court's discussion in *Papasan.* The Court recognized that perhaps there are several possible ways to address this issue. First, assuming that the specific language of the act is determinative, I conclude that the specific language of section 14 gives enough import to the general grant language of section 7 to create a trust. In my view, Congress intended more than an "honorary" obligation to flow from its statute because it specified a minimum price upon sale. In addition, the creation of a "permanent school-fund" indicates intent to create a trust. Read in pari materia, sections 7 and 14 evidence the intent of Congress to create a trust.

Second, the Court in *Papasan* stated that perhaps there is no difference between even the earliest and simplest acts and the latest and most particular. *Papasan, supra*, at 289, n. 18, 106 S.Ct. at 2946, n. 18 (citing S.Rep. No. 454 61st Cong., 2d Sess., 18–20 (1910)). Implicit in that rationale is that the Court has reversed itself as to the effect of the school lands clauses in enabling acts as the most recent decisions hold in favor of enforceable trusts. *See, e.g., Lassen, supra; Alamo, supra.* Thus, even the language of the Alabama and Michigan acts, if considered de novo today, might be held to create enforceable obligations on the states.

Finally, I am further guided by the Court's other expressed rationale in *Papasan*—that perhaps the school land grants should be viewed analogously as bilateral contracts. A trust, after all, is in the nature of a hybrid contract. Given the history of school lands grants as set forth in *Alamo, supra* (discussed at part III.C.1 above), the grants could be said to have been made as part of a bargaining process between an incoming state and the federal government. By this analysis, the United States and the individual incoming state are the parties to the contract. The Court in *Papasan* expressed some concern that perhaps only the United States, but not a third party, could enforce such a "contract" against the state. At least in this context, however, that concern is misplaced.

In keeping with the contract analysis, the public schools of Colorado are archetypal third-party beneficiaries of the contract. To create a third-party beneficiary, the intent of both contracting parties to benefit the third party by the contract must be evident from the contract and/or the surrounding circumstances. *See, e.g., E.B. Roberts Construction Co. v. Concrete Contractors, Inc.*, 704 P.2d 859 (Colo.1985) ("While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both."). The intent of the United States to benefit public schools is evident from the Enabling Act itself, and the intent of Colorado is manifest in its express creation of a school lands trust in favor of common schools in its original constitution. Colo. Const. Art. IX (1875). Even the Colorado electorate's approval of Amendment 16 recognizes that the school lands were granted by the federal government to Colorado in trust for the common schools. Art. IX § 9(6) ("The Board shall serve as the trustee for the lands *granted to the state in public trust by the federal government* . . . .") (emphasis added); Art. IX § 10(1) ("The school lands are an endowment of land assets held in a perpetual, inter-generational public trust for he support of public schools. . . .").

In addition, the terms of such a contract can be defined by reference to the Enabling Act and the Colorado Constitution. The Enabling Act provides the express terms of the contract, and any ambiguity therein is resolved by reference to the Colorado Constitution as evidence of Colorado's intent in entering the compact with the federal government—specifically, its intent to act as trustee of school lands for the benefit of the public schools. To this extent, even though the plaintiffs' cause of action may rest upon contract principles, the Colorado Enabling Act, a federal statute, is the genesis of the contract terms. Therefore, plaintiffs' claim, tethered to the Supremacy Clause of the United States Constitution, still arises under federal law, and jurisdiction is proper in federal court.

I hold that Colorado has an obligation enforceable under the Supremacy Clause to act as trustee for the school lands granted under the Colorado Enabling Act for the benefit of the public schools. Under my holding, the obligations of Colorado are essentially the same under a straight trust theory and a contract analysis. I will analyze the facial constitutionality of Amendment 16 under a straight trust theory, recognizing that the trust is unique in that it exists in perpetuity.

### D. *Facial Compliance of Amendment 16 with the Colorado Enabling Act*

Concluding, as I have, that the Colorado Enabling Act creates an enforceable trust in favor of the common schools, the question

remains whether Amendment 16 violates that trust. The defendants contend that plaintiffs cannot show that Amendment 16 is facially invalid and, therefore, they are entitled to summary judgment. I agree.

 Plaintiff's concede that this is a facial challenge to Amendment 16. As such, I must begin with the presumption that Amendment 16 is constitutional. *National R.R. Passenger Corp. v. Atchison, Topeka, and Santa Fe Ry. Co.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985). Plaintiffs, as the parties attacking the constitutionality of Amendment 16, must show beyond a reasonable doubt that it is unconstitutional. *Villanueva v. Carere*, 873 F.Supp. 434, 447 (D.Colo.1994), *aff'd*, 85 F.3d 481 (10th Cir.1996). If the defendants present a fairly possible construction of Amendment 16 that would result in it being constitutional, I must accept that construction and reject any construction offered by plaintiffs that results in unconstitutionality. *Communications Workers of America v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988). For the following reasons, I conclude that plaintiffs have failed to meet their burden to demonstrate the unconstitutionality of Amendment 16 beyond a reasonable doubt.

 Plaintiffs challenge a series of specific sections of Amendment 16. I will deal with each challenged section in turn. However, two fundamental propositions guide my inquiry. First, as this trust was clearly intended to benefit the public schools in perpetuity, Colorado, as trustee, is under no obligation to maximize the benefit of the trust to the current public schools. Second, long-range planning is prudent, and so long as decisions are made with the sole purpose of benefitting the common schools both now and for generations to come, Amendment 16 does not violate the trust.

### 1. Section 3 of Amendment 16

 This section states, in pertinent part:

The public school fund of this state shall, except as provided in this article IX, forever remain inviolate.... No part of this fund, principal, interest or other income shall ever be transferred to any other fund, or used or appropriated, except as provided in this Article IX.... The state shall supply all losses thereof that may in any manner occur. In order to assist public schools in the state in providing necessary buildings, land, and equipment, the general assembly may adopt laws establishing the terms and conditions upon which the state treasurer may (1) invest the fund in bonds of school districts, (2) use all or any portion of the fund or the interest or other income thereon to guaranty bonds issued by school districts, or (3) make loans to school districts.

Plaintiffs argue that this section violates the terms of the trust established by the Colorado Enabling Act beyond a reasonable doubt because it permits the school fund to be used for purposes outside of paying out interest to the schools directly. I disagree.

The defendants fairly construe this section as simply creating a mechanism for directly benefitting schools "in providing necessary buildings, land, and equipment." In addition, schools could essentially benefit twice from this provision—direct aid in bond projects and increased revenue through the investment of school fund money. To the extent that this section permits the Board to invade the corpus of the trust for the benefit of schools, it is permitted to do so under ordinary trust principles. See Restatement (3d) of Trusts, § 191 (1991) (trustee has the power to "mortgage, pledge, or otherwise encumber trust property for trust purposes."). Nothing in section 3 requires the Board or the state to do anything that is inconsistent with benefitting the public schools, the beneficiaries of the trust. As defendants' reading of the statute is possible, I am bound to accept it in this facial challenge, and I will not enjoin this section.

### 2. Section 9(2) of Amendment 16

 Plaintiffs argue that § 9(2) conflicts with the Colorado Enabling Act because it changes the fiduciary duties of the Board. Section 9(2) states, in pertinent part:

The Board shall be composed of one person with substantial experience in production agriculture, one person with substantial experience in public primary or secondary education, one person with

substantial experience in local government and land use planning, and one citizen at large.

Plaintiffs contend that Amendment 16's mandate that the Board be comprised of persons with experience in agriculture and land use planning necessitates that such persons will be impermissibly motivated by special interests, unrelated to the benefit of public schools. Plaintiff's fear of divided loyalty is understandable, but I cannot presume that the board members will violate their fiduciary duties. Thus, I conclude that there is nothing facially invalid about requiring a diverse Board, so long as the Board is motivated solely to benefit the public schools. Diversity in experience on the Board may help it make more prudent decisions, considering a variety of factors and circumstances, thereby benefitting the public schools. Accordingly, I see no basis to enjoin this section in the context of a facial challenge.

### 3. Section 9(5) of Amendment 16

■ I preliminarily enjoined this section in my bench ruling of January 15, 1997. My concern at that time was that § 9(5) changed the fiduciary duties of the trustees in contravention of the trust created by the Enabling Act and the Supremacy Clause. I am now convinced, however, that § 9(5) should not be enjoined.

Section 9(5) provides: "The individual members of the Board shall have no personal liability for any action or failure to act as long as such action or failure to act does not involve willful or intentional malfeasance or gross negligence." According to the Enabling Act as interpreted herein, the State of Colorado is the trustee for the management of the school lands. Colorado has delegated that authority and duty to the Board, which is, effectively, the trustee. This section affects the liability only of the individual Board members, not the Board itself.

The individual members may take no action on their own with regard to the school lands. They may only act as a Board. The Board is subject to the fiduciary duties generally applicable to trustees. § 10(1). Consequently, it is contrary to neither the Enabling Act nor ordinary trust principles to alter the standards for liability of the individual Board members.

### 4. Section 9(6) of Amendment 16

■ Plaintiffs object to this section because, they argue, it impermissibly divides the loyalties of the Board. Section 9(6) states, in pertinent part, that "The Board ... shall have the duty to manage, control, and dispose of [school] lands in accordance with the purposes for which said grants of land were made and section 10 of this Article IX...." Plaintiffs contend this section indicates that the state regards the requirements of section 10 as distinct from the "purposes for which said grants of land were made" (i.e., to create a trust for the public schools). Section 10, however, can be fairly read as merely providing specific instructions on how to further the purposes for which the lands were granted. Therefore, so long as nothing in section 10 violates the Supremacy Clause, this section is not facially invalid.

### 5. Section 9(7) of Amendment 16

■ Section 9(7) authorizes the Board to undertake "non-simultaneous exchanges of land." Nothing in this section, however, violates either the requisites of the Enabling Act or general trust principles. Section 14 of the Enabling Act provides that the two sections in every township granted for the support of the common schools be disposed of only at public sale, the interest of which is to be expended in support of the common schools. Plaintiffs contend that § 9(7)'s provision that money from non-simultaneous land exchanges are held in a separate account until the exchange is completed violates section 14 of the Enabling Act. Plaintiffs argue that such money should be placed in the permanent school fund instead.

Plaintiffs' argument rests, however, on the premise that non-simultaneous land exchanges are really sales. I cannot agree. Deferred exchanges are common and acceptable transactions in real estate law and are not, as recognized by the IRS, sales or taxable events. *See* Internal Revenue Service Code § 1031; 26 U.S.C. § 1031. Accordingly, § 9(7)'s mechanism for allowing non-si-

multaneous land exchanges is not contrary to section 14 of the Enabling Act.

In addition, exchanges of trust assets may be necessary to the prudent and effective management of a trust. 76 Am.Jur.2d Trusts § 433 (1990) (transfer of trust assets is common and may be necessary for reinvestment into more productive assets). Accordingly, so long as the exchanges are performed to benefit the public schools, neither the Enabling Act nor common trust law prohibits non-simultaneous exchanges of land within the trust.

### 6. Section 10(1)(a) of Amendment 16

[26] Section 10(1)(a) states: "The people of the State of Colorado recognize (a) that the state school lands are an endowment of land assets held in a perpetual, inter-generational trust for the support of public schools, which should not be significantly diminished." Plaintiffs argue that the language "should not be significantly diminished" precludes the sale of any significant portion of lands. According to *Lassen, supra* at 463, 87 S.Ct. at 587, that is not the purpose of the school lands trusts created by the enabling acts of western states:

> The grant was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institutions designated by the [Enabling] Act. It was not supposed that Arizona would retain all the lands given it for actual use by the beneficiaries; the lands were obviously too extensive and too often inappropriate for the selected purposes. Congress could scarcely have expected, for example, that many of the 8,000,000 acres of its grant "for the support of the common schools," all chosen without regard to topography or school needs would be employed as building sites. It intended instead that Arizona would use the general powers of sale and lease given it by the Act to accumulate funds with which it could support its schools.

I agree that the generation of funds from Colorado school lands is essential to the prudent management of the trust; however, I am not persuaded that section 10(1)(a) necessarily contravenes that premise. The "should not be significantly diminished" lan-guage can be interpreted fairly to apply to the trust corpus itself, including both lands and money. Nothing in this section requires that Colorado cease to convert lands into money by the sale of lands for the benefit of the trust and the public schools. Rather, as with all decisions made regarding these lands, the Board must determine whether the sale or the continued ownership of the lands will most benefit the public schools.

### 7. Section 10(1)(c) of Amendment 16

This section states:

(c) That the economic productivity of all lands held in public trust is dependent on sound stewardship, including protecting and enhancing the beauty, natural values, open space, and wildlife habitat thereof, for this and future generations. In recognition of these principles, the Board shall be governed by the standards set forth in this section 10 in the discharge of its fiduciary obligations, in addition to other laws generally applicable to trustees.

Again, Plaintiffs argue that this section divides the duty of loyalty through standards for decision-making that are repugnant to the singular purpose of the trust—to benefit the common schools. Particularly, the plaintiffs are concerned that the Board will be bound to make decisions based on "protecting and enhancing the beauty, natural values, open space, and wildlife habitat" of school lands rather than maximizing revenues from such lands.

First, the trust does not impose such a duty. Second, although I agree that § 10(1)(c) could be read as injecting improper conflicts into the stewardship of the trust, it does not have to be read that way. Rather, viewing this section, as I must, with a presumption of constitutionality, § 10(1)(c) can be read fairly to provide factors to be considered in making the ultimate decision as to what choice will create the most benefit for the public schools. Often, as defendants argue, maintenance of the "natural values" of a tract of land will enhance its future economic value as well. Accordingly, under the defendants' reading of this section, which I conclude is possible for the purposes of this facial challenge, the duty of the trustee re-

mains the same—to benefit the public schools. The other considerations mentioned are simply means to that end.

I do not intend to imply, however, that "protecting and enhancing the beauty, natural values, open space, and wildlife habitat" is, itself, a benefit to the public schools. The defendants implied several times during the preliminary injunction and motions hearings that protection of the environment benefits the state as a whole, which, in turn, benefits the plaintiffs. The defendants have it backwards. There are only two benefits that the public schools in Colorado can garner directly from the school lands provided in trust by the Enabling Act—land and money. All decisions made involving the management of the trust, therefore, must further one of those ends either immediately or for the future of public schools. Because I conclude that, as phrased, § 10(1)(c) seeks only to further the "economic productivity" of the school lands through consideration of natural resource concerns, I will not enjoin it in this facial challenge.

### 8. Section 10(1) of Amendment 16

 Section 10(1) goes on to state that the Board shall "provide for the prudent management, location, protection, sale, exchange, or other disposition of lands ... in order to produce reasonable and consistent income over time." The plaintiffs object to the requirement that the Board manage the trust to "produce reasonable and consistent income over time" as opposed to the maximum amount of money possible. Here again, I disagree that the Board is bound to produce the maximum amount of money possible in the short term. The choice of the trustee (Colorado) to manage the lands to produce reasonable and consistent income over time is reasonable and prudent given the perpetual nature of the trust. It is axiomatic, of course, that in any final disposition of trust land, the Board is bound to produce the maximum benefit possible to the public schools.

### 9. Section 10(1)(a) of Amendment 16

 Plaintiffs challenge the following language in § 10(1)(a), which provides that the Board shall:

(a) Prior to the lease, sale, or exchange of any lands for commercial, residential or industrial development, determine that the income from the lease, sale, or exchange can reasonably be anticipated to exceed the fiscal impact of such development on local school districts and state funding of education from increased enrollment associated with such development.

I am not persuaded that this provision conflicts with any of the trust duties imposed by the Enabling Act. It is reasonable and prudent that, for the welfare of public schools, the Board should evaluate the financial impact of any sale, lease, or exchange on the funding of public schools in general. This section does not change the duties of the trustee to make decisions "for the benefit of the common schools" as required by the Enabling Act.

### 10. Section 10(1)(b)(I) of Amendment 16

 Plaintiffs challenge this section, which provides for a stewardship trust of lands, on the grounds that it contravenes the trust requirement that school lands benefit exclusively the public schools. Section 10(1)(b)(I) provides that the Board shall:

(b) Protect and enhance the long-term productivity and sound stewardship of the trust lands held by the Board, by, among other activities:

(I) Establishing and maintaining a long-term stewardship trust of up to 300,000 acres of land that the Board determines through a statewide public nomination process to be valuable primarily to preserve long-term benefits to maximize options for continued stewardship, public use, or future disposition, by permitting only those uses, not necessarily precluding existing uses or management practices, that will protect and enhance the beauty, natural values, open space, and wildlife habitat thereof; at least 200,000 acres of which land shall be designated on or before January 1, 1999, and at least an additional 95,000 acres of which land shall be designated on or before January 1, 2001, specific parcels of land held in the stewardship trust may be removed from the trust only upon the affirmative vote of four members

of the Board and upon the designation or exchange of an equal or greater amount of additional land into said trust.

In effect, this provision creates a permanent 295,000 acre "stewardship trust" from Enabling Act trust lands. Although lands within the stewardship trust may be removed and sold (by a vote of four of five Board members), they must also be replaced by designation or exchange of an equal or greater amount of land. Therefore, once the mandatory designations are completed in 2001, the amount of land in the stewardship trust cannot fall below 295,000 acres in perpetuity. Plaintiffs argue that this section makes it impossible for the Board to generate the greatest benefit possible for the schools by eventually selling all of the land.

The defendants argue that this provision is simply another example of the trustee (Colorado) making a conscious choice to diversify the trust corpus and recognize the long-term benefits to the trust of land conservation. I am not convinced that plaintiffs' arguments can be refuted so easily. The trust is comprised of both the school lands and the money they generate from sales and leases. The Court in *Lassen* indicated that, in passing the New Mexico–Arizona Enabling Act, Congress contemplated that the majority of lands granted would be sold or leased and the money used to support common schools. *Lassen,* supra at 463, 87 S.Ct. at 587. Therefore, the trust corpus may, over time, consist of decreasing amounts of land and increasing amounts of money.

Thus, it is possible that at some point in Colorado's future, only 295,000 acres of school lands will remain, all within the stewardship trust and subject to the land use requirements of § 10(1)(b)(I). At that point, according to this section, none of the lands could ever be sold because there would be no lands with which to replace the lands sold. Consequently, if it were in the best interests of the public schools to sell such lands, the Board members would be unable to fulfill their fiduciary duties to act in the best interest of the public schools.

In addition, even before enough land is sold to reach the 295,000 acre minimum, there may come a time when it is not in the best interest of the schools to place 295,000 acres into a stewardship trust under the conditions stated. For example, if it were in the long-term best interests of the public schools to strip mine and sell every acre currently held in the trust, this section would be unconstitutional because it would prevent such uses and sales. Such possibilities, however, are just that—possibilities, and I may not rest my decision on hypotheticals in this facial challenge.

Although to put even one acre of school lands into the stewardship trust if it is not in the best long-term interests of the public schools would contravene the Enabling Act and Supremacy Clause, I cannot assume in this facial challenge that present compliance with this section is unconstitutional. Nor can I presume to know whether, in the future, the Board members will inevitably be unable to comply with both the requirements of this section and their fiduciary obligations to the public schools. It may be that there are 295,000 acres of school lands that will provide greater benefits to the public schools if managed in compliance, and leased for uses consistent, with this section. I cannot presume that the Board members will breach their fiduciary duties.

In short, the plaintiffs' concerns regarding this section, though understandable, are not yet ripe for consideration.

11. Section 10(1)(b)(II) of Amendment 16

Plaintiffs contend that this section impermissibly requires specific action by the Board for purposes other than for the benefit of the common schools. Section 10(1)(b)(II) requires the Board to "[include] in agricultural leases terms, incentives, and lease rates that will promote sound stewardship and land management practices, long-term agricultural productivity, and community stability." Here again, I conclude that this section does not require the Board to take any action that is not consonant with its duty to benefit the sole beneficiary of the trust—the common schools. Facially, there is no reason why "sound stewardship and land management practices, long-term agricultural productivity, and community stability" are at

odds with the best interests of the common schools.

### 12. Section 10(1)(b)(III) of Amendment 16

Plaintiffs challenge this section because, they again argue, it divides the loyalties of the trustee. Section 10(1)(b)(III) states that the Board shall "protect and enhance the long-term productivity ... of the trust lands held by the Board, by, among other activities:"

> (III) Managing the development and utilization of natural resources in a manner which will conserve the long-term value of such resources, as well as existing and future uses, and in accordance with state and local laws and regulations.

Here again, I cannot conclude that managing the development and utilization of natural resources to preserve long-term value is necessarily at odds with the duties of the Board as trustee of this inter-generational trust. Such considerations may be beneficial, and this section is, therefore, not facially invalid.

### 13. Section 10(1)(c) of Amendment 16

█ This section requires the Board to "comply with valid local land use regulations and land use plans." Plaintiffs argue that this section should be enjoined because state trust lands are not subject to local land use regulations and land use plans. Pltf. Br. at 35 (citing *People ex rel. Dunbar v. City of Littleton*, 183 Colo. 195, 515 P.2d 1121 (1973). I need not decide that issue, however, because, in the context of this facial challenge, there is no reason to believe that compliance with a particular local land use regulation or plan would contravene the duties of the trustee.

### 14. Section 10(1)(e) of Amendment 16

█ This section states that the Board shall:

> Provide opportunities for the public school districts within which such lands are located to lease, purchase, or otherwise use such lands or portions thereof as are necessary for school building sites, at an amount to be determined by the Board, which shall not exceed the appraised fair

market value, which amount may be paid over time.

Plaintiffs argue that the phrase "which shall not exceed the appraised fair market value" should be enjoined because the Board, as trustee, should never accept any less than the fair market value. First, I am not convinced that schools, as the beneficiaries of the trust, cannot be given a better price than other buyers or lessees of school lands. I need not decide that question, however, as nothing in this section requires the Board to accept any less than the most money it determines it can garner for a particular tract of school lands.

In addition, plaintiffs argue that this section contravenes the specific requirement of section 14 of the Enabling Act that school lands are to be sold only at public sale. Nothing in this section, however, requires that school lands be sold without a public sale. The state could sell a tract of trust land at public sale to a public school district for an amount not exceeding the appraised fair market value. Hence, I will not enjoin this section.

### IV.

█ There are two fundamental predicates to plaintiffs' facial challenge to Amendment 16. First, plaintiffs posit that the trustee of the school lands is duty bound to maximize revenues. Given the unique nature of this trust in perpetuity, in light of the Colorado Enabling Act, I can find no such duty. Plaintiffs' second concern, understandably felt, is that the trustee's duty of loyalty is divided. The defendants' arguments were shot through with justifications of benefit to "the people of Colorado." Although the trustee may not be duty bound to maximize revenues, it is clear beyond doubt that the trustee is duty bound to manage the trust corpus solely for the benefit of the public schools. The fairly possible reading of Amendment 16 presented by defendants allows the pole star of undivided loyalty to remain fixed. In this light, then, plaintiffs have failed in their facial challenge to Amendment 16 to overcome the presumption of constitutionality beyond a reasonable doubt.

Accordingly, it is ORDERED that:

1. Defendants' motion for summary judgment is GRANTED,

2. The injunction against implementation of section 9(5) of Amendment 16 is DISSOLVED;

3. Plaintiffs' complaint is DISMISSED; and

4. Defendants are awarded their costs.